## ILLINOIS CENTRAL RAILROAD COMPANY *v.* ILLINOIS.

## CHICAGO *v.* ILLINOIS CENTRAL RAILROAD COMPANY.

## ILLINOIS *v.* ILLINOIS CENTRAL RAILROAD COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 419, 608, 609. Argued October 12, 13, 14, 1892. — Decided December 5, 1892.

The ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States.

The same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies, which

obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations.

The roadway of the Illinois Central Railroad at Chicago as constructed, two hundred feet in width, for the whole distance allowed for its entry within the city, with the tracks thereon, and with all the guards against danger in its approach and crossings, and the breakwater beyond its tracks on the east, and the necessary works for the protection of the shore on the west, in no respect interfere with any useful freedom in the use of the waters of the lake for commerce, foreign, interstate or domestic; and, as they were constructed under the authority of the law, (Stat. of February 17, 1851, Laws Ill. 1851, 192,) by the requirement of the city as a condition of its consent that the company might locate its road within its limits, (Ordinance of June 14, 1852,) they cannot be regarded as such an encroachment upon the domain of the State as to require the interposition of the court for their removal or for any restraint in their use.

The Illinois Central Railroad Company never acquired by the reclamation from the waters of the lake of the land upon which its tracks are laid, or by the construction of the road and works connected therewith, an absolute fee in the tract reclaimed, with a consequent right to dispose of the same to other parties, or to use it for any other purpose than the one designated — the construction and operation of a railroad thereon, with one or more tracks and works, in connection with the road or in aid thereof.

That company acquired by the construction of its road and other works no right as a riparian owner to reclaim still further lands from the waters of the lake for its use, or for the construction of piers, docks and wharves, in the furtherance of its business; but the extent to which it could reclaim the land under water was limited by the conditions of the ordinance of June 14, 1852, which was simply for the construction of a railroad on a tract not to exceed a specified width, and of works connected therewith.

The construction of a pier or the extension of any land into navigable waters for a railroad or other purposes, by one not the owner of lands on the shore, does not give the builder of such pier or extension, whether an individual or corporation, any riparian rights.

The railroad company owns and has the right to use in its business the reclaimed land and the slips and piers in front of the lots on the lake north of Randolph Street which were acquired by it, and in front of Michigan Avenue between the lines of Twelfth and Sixteenth streets, extended, unless it shall be found by the Circuit Court on further examination, that the piers as constructed extend beyond the point of navigability in the waters of the lake; about which this court is not fully satisfied from the evidence in this case.

The railroad company further has the right to continue to use, as an addi-

tional means of approaching and using its station-grounds, the spaces and the rights granted to it by the ordinances of the city of Chicago of September 10, 1855, and of September 15, 1856.

The act of the Legislature of Illinois of April 16, 1869, granting to the Illinois Central Railroad Company, its successors and assigns, " all the right and title of the State of Illinois in and to the submerged lands constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot twenty-one, south of and near to the roundhouse and machine shops of said company, in the south division of the said city of Chicago," cannot be invoked so as to extend riparian rights which the company possessed from its ownership of lands in sections 10 and 15 on the lake; and as to the remaining submerged lands, it was not competent for the legislature to thus deprive the State of its ownership of the submerged lands in the harbor of Chicago, and of the consequent control of its waters; and the attempted cession by the act of April 16, 1869, was inoperative to affect, modify, or in any respect to control the sovereignty and dominion of the State over the lands, or its ownership thereof, and any such attempted operation of the act was annulled by the repealing act of April 15, 1873, which to that extent was valid and effective.

There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it.

The fee of the made or reclaimed ground between Randolph street and Park Row, embracing the ground upon which rest the tracks and the breakwater of the railroad company south of Randolph street, is in the city, and subject to the right of the railroad company to its use of the tracks on ground reclaimed by it and the continuance of the breakwater, the city possesses the right of riparian ownership, and is at full liberty to exercise it.

The city of Chicago, as riparian owner of the grounds on its east or lake front of the city, between the north line of Randolph street and the north line of block twenty-three, each of the lines being produced to Lake Michigan, and in virtue of authority conferred by its charter, has the power to construct and keep in repair on the lake front, east of said premises, within the lines mentioned, public landing places, wharves, docks and levees, subject, however, in the execution of that power, to the authority of the State to prescribe the lines beyond which piers, docks, wharves and other structures, other than those erected by the general government, may not be extended into the navigable waters of the harbor, and to such supervision and control as the United States may rightfully exercise. "

IN EQUITY. These appeals were taken from a decree in a bill or information filed by the State of Illinois against the

Illinois Central Railroad Company, the City of Chicago, and the United States, and a cross bill therein filed by the city against the Railroad Company, the United States and the State. 33 Fed. Rep. 730. The object of the litigation was to determine the rights, respectively, of the State, of the city, and of the Railroad Company in land, submerged or reclaimed, in front of the water line of the city on Lake Michigan.

As the record came to this court the cause was further entitled "*The United States Appellant v. The People of the State of Illinois et al.,* No. 610." On the suggestion of the Solicitor General that the United States had never been a party to these suits in the court below, and had never taken an appeal from the decree, that title was dropped from the opinion of the court.

The facts were stated by Mr. Justice Harlan in his opinion in the court below, as follows:[1]

It is necessary to a clear understanding of the numerous questions presented for determination, that we should first trace the history of the title to these several bodies of lands up to the time when the Illinois Central Railroad was located within the limits of Chicago.

First. *As to the lands embraced in the Fort Dearborn Reservation.*

In the year 1804 the United States established the military

---

[1] This court, in its opinion, *infra,* 434, says of this statement: "We agree with the court below that, to a clear understanding of the numerous questions presented in this case, it was necessary to trace the history of the title to the several parcels of land claimed by the company. And the court, in its elaborate opinion, 33 Fed. Rep. 730, for that purpose referred to the legislation of the United States and of the State, and to ordinances of the city and proceedings thereunder, and stated, with great minuteness of detail, every material provision of law and every step taken. We have with great care gone over the history detailed and are satisfied with its entire accuracy. It would, therefore, serve no useful purpose to repeat what is, in our opinion, clearly and fully narrated." After this full endorsement, the Reporter has thought it his duty to make use of this statement, making such few changes, mostly verbal, as have been found necessary to adapt it to the issues settled by the opinion of the court in this case.

post of Fort Dearborn, immediately south of Chicago River, and near its mouth, upon the southwest fractional quarter of section 10. It was occupied by troops as well when Illinois, in 1818, was admitted into the Union, as when Congress passed the act of March 3, 1819, authorizing the sale of certain military sites. By that act it was provided:

"That the Secretary of War be, and he is hereby, authorized, under the direction of the President of the United States, to cause to be sold such military sites, belonging to the United States, as may have been found, or become, useless for military purposes. And the Secretary of War is hereby authorized, on the payment of the consideration agreed for, into the treasury of the United States to make, execute and deliver all needful instruments conveying and transferring the same in fee; and the jurisdiction, which had been specially ceded, for military purposes, to the United States, by a State, over such site or sites, shall thereafter cease. 3 Stat. 520, c. 88.

In 1824, upon the written request of the Secretary of War, the southwest quarter of fractional section 10, containing about 57 acres, and within which Fort Dearborn was situated, was formally reserved by the Commissioner of the General Land Office from sale and for military purposes. *Wilcox* v. *Jackson*, 13 Pet. 498, 502. The United States admit, and it is also proved, that the lands so reserved were subdivided in 1837 by authority of the Secretary — he being represented by one Matthew Birchard, as special agent and attorney for that purpose — into blocks, lots, streets and public grounds called the "Fort Dearborn Addition to Chicago." And on the 7th day of June, 1839, a map or plat of that addition was acknowledged by Birchard, as such agent and attorney, and was recorded in the proper local office. A part of the ground embraced in that subdivision was marked on the record plat "Public ground forever to remain vacant of buildings."

The plat of that subdivision is substantially reproduced on page 392, as Map A.

The lots designated on this plat were sold and conveyed by the United States to different purchasers. The United States expressly reserved from sale all of the Fort Dearborn Addition

MAP A.

Fort-Dearborn addition to CHICAGO.

(including the ground marked for streets) north of the south line of lot 8 in block 2, lots 4 and 9 in block 4, and lot 5 in block 5, projecting said lines across the adjacent streets.   The grounds so specially reserved remained in the occupancy of the General Government for military purposes from 1839 until after 1845.   The legal effect of that occupancy appears in *United States* v. *Chicago*, 7 How. 185.   The city of Chicago having proposed, in 1844, to open Michigan Avenue through the lands so reserved from sale, notwithstanding, at the time, they were in actual use for military purposes, the United States instituted a suit in equity to restrain the city from so doing. It appeared in the case that the agent of the General Government gave notice, at the time of selling the other lots, that the ground in actual use by the United States was not then to be sold.   It also appeared that the act of March 4, 1837, incorporating the city of Chicago, and designating the district of country embraced within its limits expressly excepted "the southwest fractional quarter of section 10, occupied as a military post, until the same shall become private property." Ill. Laws, 1837, pp. 38, 74.

The court held that the city had no right to open streets through that part of the ground which, although laid out in lots and streets, had not been sold by the government; that its corporate powers were limited to the part which, by sale, had become private property; and that the streets laid out and dedicated to public use by Birchard, the agent of the Secretary of War, did not, merely by his surveying the land into lots and streets, and making and recording a map or plat thereof, convey the legal estate in such streets to the city, and thereby authorize it to open them for public use, and assume full municipal control thereof.   The court held to be untenable the claim of the city that "because streets had been laid down on the plan by the agent [Birchard] part of which extended into the land not sold, those parts had, by this alone, become dedicated as highways and the United States had become estopped to object."   Further: "It is entirely unsupported by principle or precedent, that an agent, *merely by protracting on the plan* those streets into the reserved line and amidst lands not sold,

nor meant then to be sold, but expressly reserved, could deprive the United States of its title to real estate, and to its important public works." See also *Irwin* v. *Dixion*, 9 How. 9, 31.

Second. *As to the lands in controversy embraced in Fractional Section* 15.

This section is on the lake shore, immediately south of section 10. The particular lands, the history of the title to which is to be now examined, are between the west line of the street now known as Michigan Avenue and the roadway or wayground of the Illinois Central Railroad Company, and between the middle line of Madison street and the middle line of Twelfth street, excluding what is known as Park Row or block 23, north of Twelfth street.

. By an act of the Illinois legislature of February 14, 1823, entitled "An act to provide for the improvement of the internal navigation of this State," certain persons were constituted commissioners to devise and report upon measures for connecting, by means of a canal and locks, the navigable waters of the Illinois River and Lake Michigan. Ill. Laws, 1823, p. 151. This was followed by an act of Congress, approved March 2, 1827, entitled "An act to grant a quantity of land to the State of Illinois, for the purpose of aiding in opening a canal to connect the waters of the Illinois River with those of Lake Michigan," granting to this State, for the purposes of such enterprise, a quantity of land, equal to one-half of five sections in width, on each side of the proposed canal (reserving each alternate section to the United States), to be selected by the Commissioner of the General Land Office, under direction of the President; said lands to be "subject to the disposal of the said State for the purpose aforesaid, and for no other;" and said canal to remain forever a public highway for the use of the national government, free from any charge for any property of the United States passing through it. 4 Stat. 234, c. 51.

The power of the State to dispose of these lands was further recognized or conferred by the third section of the act, as follows: SEC. 3. "That the said State, under the authority of the legislature thereof, after the selection shall have been so made,

shall have power to sell and convey the whole or any part of the said land, and to give a title in fee simple therefor to whomsoever shall purchase the whole or any part thereof." 4 Stat. 234.

By an act of the Illinois legislature of January 22, 1829, entitled "An act to provide for constructing the Illinois and Michigan Canal," the commissioners for whose appointment that act made provision were directed to select, in conjunction with the Commissioner of the General Land Office, the alternate sections of land granted by the act of Congress, such commissioners being invested with the power, among others, "to lay off such parts of said donation into town lots as they may think proper, and to sell the same at public sale in the same manner as is provided in this act for the sale of other lands." Ill. Laws, 1829.

The act of 1829 was amended February 15, 1831, so as to constitute the Canal Commissioners a board to be known as the "Board of Canal Commissioners of the Illinois and Michigan Canal," with authority to contract and be contracted with, sue and be sued, plead and be impleaded, and with power of control in all matters relating to said canal. Ill. Laws, 1830, 1831, 39.

Pursuant to and in conformity with said acts of Congress and of the legislature of Illinois, the selection of lands for the purposes specified was made by the proper authorities, and approved by the President on the 21st of May, 1830. Among the lands so selected was said fractional section 15.

By an act of the Illinois legislature, approved January 9, 1836, entitled "An act for the construction of the Illinois and Michigan Canal," the Governor was empowered to negotiate a loan of not exceeding $500,000, on the credit and faith of the State, as therein provided, for the purpose of aiding, in connection with such means as might be received from the United States, in the construction of the Illinois and Michigan Canal, for which loan should be issued certificates of stock, to be called the "Illinois and Michigan Canal stock," signed by the Auditor and countersigned by the Treasurer, bearing an interest not exceeding six per cent, payable semi-annually, and "reimburs-

able " at the pleasure of the State at any time after 1860, and for the payment of which, principal and interest, the faith of the State was irrevocably pledged. The same act provided for the appointment of three commissioners to constitute a board to be known as " The Board of Commissioners of the Illinois and Michigan Canal," and to be a body politic and corporate, with power to contract and be contracted with, sue and be sued, plead and be impleaded, in all matters and things relating to them as canal companies, and to have the immediate care and superintendence of the canal and all matters relating thereto. Ill. Laws, 1836, 145.

That act contained, among other provisions, the following:

" SEC. 32. The commissioners shall examine the whole canal route, and select such places thereon as may be eligible for town sites, and cause the same to be laid off into town lots, and they shall cause the canal lands in or near Chicago, suitable therefor, to be laid off into town lots.

" SEC. 33. And the said Board of Canal Commissioners shall, on the twentieth day of June next, proceed to sell the lots in the town of Chicago, and such parts of the lots in the town of Ottawa, as also fractional section Fifteen adjoining the town of Chicago, it being first laid off and subdivided into town lots, streets and alleys, as in their best judgment will best promote the interest of the said canal fund : *Provided, always,* That before any of the aforesaid town lots shall be offered for sale, public notice of such sale shall have been given." . . . Ill. Laws, 1836, 150. The revenue arising from the canal, and from any lands granted by the United States to the State for its construction, together with the net tolls thereof, were pledged by the act for the payment of the interest accruing on the said stock, and for the reimbursement of the principal of the same. *Ibid.* § 41; 153.

In 1836 the Canal Commissioners, under the authority conferred upon them by the statutes above recited, caused fractional section 15 to be subdivided into lots, blocks, streets, etc., a map whereof was made, acknowledged and recorded on the 20th of July, 1836, which map is substantially reproduced on page 397 as Map B.

**MAP B.**

FRACTIONAL SECTION Nº 15 Tp.
39 NORTH RANGE 14 EAST OF THE
THIRD PRINCIPAL MERIDIAN
SURVEYED AND SUBDIVIDED BY THE
BOARD OF CANAL COMMISSIONERS,
PURSUANT TO LAWS IN THE
MONTH OF APRIL A.D. 1836.

LAKE MICHIGAN

397

At the time this map was made and recorded fractional sections 15 and 10 were both within the limits of the "Town" of Chicago, except that by the act of February 11, 1835, changing the corporate powers of that town, it was provided "that the authority of the Board of Trustees of the said Town of Chicago shall not extend over the south fractional section 10 until the same shall cease to be occupied by the United States." Ill. Laws, 1835, p. 204. But, prior to the survey and recording of the plat of fractional section 10, to wit, by the act of March 4, 1837, the city of Chicago was incorporated, and its limits defined (excluding, as we have seen, "the southwest fractional quarter of section 10, occupied as a military post, until the same shall become private property,") and was invested with all the estate, real and personal, belonging to or held in trust by the trustees of the town; its common council being empowered to lay out, make and assess streets, alleys, lanes and highways in said city, to make wharves and slips at the end of the streets, on property belonging to said city, and to alter, widen, straighten and discontinue the same. Ill. Laws, 1837, 61, § 38; 74, § 61.

Congress having, by an act approved September 20, 1850, 9 Stat. 466; c. 51, made a grant of land to Illinois for the purpose of aiding the construction of a railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi Rivers, with branches to Chicago and Dubuque, the Illinois Central Railroad Company was incorporated February 10, 1851, and was made the agent of the State to construct that road. Private Laws Ill. 1851, 61. It was granted power by its charter, Sec. 3, "to survey, locate, construct, complete, alter, maintain and operate a railroad, with one or more tracks or lines of rails, from the southern terminus of the Illinois and Michigan Canal, to a point at the city of Cairo, with a branch of the same to the city of Chicago, on Lake Michigan; and also a branch, via the city of Galena, to a point on the Mississippi River, opposite the town of Dubuque, in the State of Iowa." In addition to certain powers, privileges, immunities and franchises — including the right to purchase, hold and convey real and personal

estate, which might be needful to carry into effect the purposes and objects of its charter — it was provided that the company "shall have the right of way upon, and may appropriate to its sole use and control, for the purposes contemplated herein, land not exceeding two hundred feet in width through its entire length; may enter upon and take possession of, and use all and singular any lands, streams and materials of every kind, for the location of depots and stopping stages, for the purposes of constructing bridges, dams, embankments, excavations, station grounds, spoil banks, turnouts, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges, belonging to the State, are hereby granted to said corporation for said purposes: . . . *Provided,* That nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams." But the company's charter also provided (Sec. 8): "Nothing in this act contained shall authorize said corporation to make a location of their track within any city without the consent of the common council of said city."

Such consent was given by an ordinance of the common council of Chicago, adopted June 14, 1852, whereby permission was granted to the company to lay down, construct and maintain within the limits of that city, and along the margin of the lake within and adjacent to the same, a railroad with one or more tracks, and to have the right of way and all powers incident to and necessary therefor, upon certain terms and conditions, to wit: "The said road shall enter at or near the intersection of its southern boundary with Lake Michigan, and, following the shore on or near the margin of said lake northerly to the southern bounds of the open space known as Lake Park, in front of canal section fifteen, and continue northerly across the open space in front of said section fifteen to such grounds as the said company may acquire between the north line of Randolph Street and the Chicago River, in the Fort Dearborn addition in said city, upon which said grounds shall be located the depot of said railroad within the city, and such other build-

ings, slips or apparatus as may be necessary and convenient for the business of said company. But it is expressly understood that the city of Chicago does not undertake to obtain for said company any right of way, or other right, privilege or easement, not now in the power of said city to grant or confer, or to assume any liability or responsibility for the acts of said company." Section 1.

By other sections of the ordinance it was provided as follows:

By the second section, that the company might " enter upon and use in perpetuity for its said line of road, and other works necessary to protect the same from the lake, a width of 300 feet, from the southern boundary of said public ground near Twelfth street, to the northern line of Randolph street — the inner or west line of the ground to be used by said company to be not less than 400 feet east from the west line of Michigan Avenue and parallel thereto;"

By the third section, that they " may extend their works and fill out into the lake to a point in the southern pier not less than 400 feet west from the present east end of the same, thence parallel with Michigan Avenue to the north line of Randolph street extended; but it is expressly understood that the common council does not grant any right or privilege beyond the limits above specified, nor beyond the line that may be actually occupied by the works of said company;"

By the sixth section, that the company " shall erect and maintain on the western or inner line of the ground pointed out for its main track on the lake shore, as the same is hereinbefore defined, such suitable walls, fences or other sufficient works, as will prevent animals from straying upon or obstructing its tracks, and secure persons and property from danger, said structure to be of suitable materials and sightly appearance, and of such heights as the common council may direct, and no change thereon shall be made except by mutual consent: *Provided*, That the company shall construct such suitable gates at proper places at the ends of the streets, which are now or may hereafter be laid out, as may be required by the common council, to afford safe access to the lake; *And provided, also*, That, in case of the construction of an outside

harbor, streets may be laid out to approach the same, in the manner provided by law, in which case the common council may regulate the speed of locomotives and trains across them;"

By the seventh section, that the company "shall erect and complete within three years after they shall have accepted this ordinance, and shall forever thereafter maintain, a continuous wall or structure of stone masonry, pier work or other sufficient material, of regular and sightly appearance, and not to exceed in height the general level of Michigan Avenue opposite thereto, from the north side of Randolph street to the southern bound of Lake Park before mentioned, at a distance of not more than 300 feet east from and parallel with the western or inner line, pointed out for said company, as specified in section two hereof, and shall continue said works to the southern boundary of the city, at such distance outside of the track of said road as may be expedient, which structure and works shall be of sufficient strength and magnitude to protect the entire front of said city, between the north lin, of Randolph street and its southern boundary, from further damage or injury from the action of the waters of Lake Michigan, and that part of the structure south of Lake Park shall be commenced and prosecuted with all reasonable despatch after acceptance of this ordinance;"

By the eighth section, that the company "shall not in any manner, nor for any purpose whatever, occupy, use or intrude upon the open ground known as Lake Park, belonging to the city of Chicago, lying between Michigan Avenue and the western or inner line before mentioned, except so far as the common council may consent, for the convenience of said company, while constructing or repairing the works in front of said ground;"

By the ninth section, that the company "shall erect no buildings between the north line of Randolph street and the south line of the said Lake Park, nor occupy nor use the works proposed to be constructed between these points, except for the passage of or for making up or distributing their trains, nor place upon any part of their works between said points any obstruction to the view of the lake from the shore, nor

suffer their locomotives, cars or other articles to remain upon their tracks, but only erect such works as are proper for the construction of their necessary tracks and protection of the same."

The company was given ninety days within which to accept the ordinance, and it was provided that upon such acceptance its terms should be embodied in a contract between the city and the company. The ordinance was accepted, and the required agreement entered into on the 8th day of July, 1852.

At the time this ordinance was passed the harbor of the city included, under the laws of the State incorporating the city, " the piers and so much of Lake Michigan as lies within the distance of one mile thereof into the lake, and the Chicago River and its branches to their respective sources." Private Laws Ill. 2d Sess. 1851, pp. 132, 147. Its common council had power, at the public expense, to construct a breakwater or barrier along the shore of the lake for the protection of the city against the encroachments of the water; " to preserve the harbor; to prevent any use of the same, or any act in relation thereto . . . tending in any degree to fill up or obstruct the same ; to prevent and punish the casting or depositing therein any earths, ashes or other substance, filth, logs or floating matter; to prevent and remove all obstructions therein, and to punish the authors thereof; to regulate and prescribe the mode and speed of entering and leaving the harbor, and of coming to and departing from the wharves and streets of the city by steamboats, canal boats, and other crafts and vessels, . . . and to regulate and prescribe by such ordinances, or through their harbor master, or other authorized officer, such a location of every canal boat, steamboat, or other craft or vessel or float, and such changes of station in, and use of, the harbor, as may be necessary to promote order therein, and the safety and equal convenience, as near as may be, of all such boats, vessels, crafts or floats ; " " to remove and prevent all obstructions in the waters which are public highways in said city, and to widen, straighten and deepen the same ; " and to " make wharves and slips at the end of streets, and alter, widen, contract, straighten and discontinue the same." _Ibid._

Under the authority of its charter, and of the ordinance of June 14, 1852, the railroad company located its tracks within the corporate limits of the city. The tracks northward from Twelfth street were laid upon piling placed in the waters of the lake, the shore line, which was crooked, being, at that time, at Park Row, about 400 feet from the west line of Michigan Avenue; at the foot of Monroe and Madison streets, about 90 feet; and at Randolph street, about 112½ feet. Since that time the space between the shore line and the tracks of the railroad company has been filled with earth by or under the direction of the city, and is now solid ground. After the construction of the track as just stated, the railroad company erected a breakwater east of its roadway, upon a line parallel with the west line of Michigan Avenue, and, subsequently, filled the space, or nearly all of it, between that breakwater and its tracks, and under its tracks, with earth and stone.

It is stated by counsel, and the record, we think, sufficiently shows, that when the road was located in 1852 nearly all of the lots bordering upon the lake, north of Randolph street, had become the property of individuals, by purchase from the United States, except a parcel adjacent to the river which had not then been sold by the General Government. Soon thereafter the company acquired the title to all of the water lots in the Fort Dearborn addition, north of Randolph street, including the remaining parcel belonging to the United States. The deed for the latter was made by the Secretary of War, October 14, 1852, and included " all the accretions made or to be made by said lake and river in front of the land hereby conveyed, and all other rights and privileges appertaining to the United States as owners of said land." The company established its passenger house at the place designated in the ordinance of 1852, and, being the owner of said water lots, north of Randolph street, it gradually pushed its works out into the shallow water of the lake to the exterior line specified in that ordinance, 1376 feet east of the west line of Michigan Avenue.

In order that the railroad company might approach its passenger depot, the common council, by ordinance, adopted

September 10, 1855, granted it permission to curve its tracks westwardly of the line fixed by the ordinance of 1852, "so as to cross said line at a point not more than 200 feet south of Randolph street, extending and curving said tracks north-westerly as they approach the depot, and crossing the north line of Randolph street, extended, at a point not more than 100 feet west of the line fixed by the ordinance, in accordance with the map or plat thereof submitted by said company and placed on file for reference." This grant was, however, upon the following conditions: That the company lay out upon its own land, west of and alongside its passenger house, a street 50 feet wide, extending from Water street to Randolph street, and fill the same up its entire length within two years from the passage of said ordinance; that it should be restricted in the use of its tracks south of the north line of Randolph street, as provided in the ordinance of 1852; and "when the company shall fill up its said tracks south of the north line of that street down to the point where said curves and side-tracks commence, and the city shall grant its permission so to fill up its tracks, it should also fill up, at the same time and to an equal height, all the space between the track so filled up and the lake shore as it now exists, from the north side of Randolph street down to the point where said curves and side-tracks intersect the line fixed by the ordinance aforesaid."

The company's tracks were curved as permitted; the street referred to was opened and has ever since been used by the public; and the required filling was done.

It being necessary that the railroad company should have additional means of approaching and using its station grounds between Randolph street and the Chicago River, the city, by another ordinance adopted September 15, 1856, granted it permission "to enter and use in perpetuity, for its line of railroad and other works necessary to protect the same from the lake, the space between its present [then] breakwater and a line drawn from a point on said breakwater 700 feet south of the north line of Randolph, extended, and running thence on a straight line to the southeast corner of its present breakwater, thence to the river: *Provided, however*, and this permission is

only given upon the express condition, that the portion of said line which lies south of the north line of Randolph street, extended, shall be kept subject to all the conditions and restrictions as to the use of the same, as are imposed upon that part of said line by the said ordinance of June 14, 1852."

In 1867 the company made a large slip just outside of the exterior line fixed by the ordinance of 1852, thereby extending its occupancy, between Randolph street and Chicago River, further to the east. Along the outer edge of this pier a continuous line of dock piling was placed, extending on a line from the river to the north line of Randolph street, 1792 feet distant from the west line of Michigan Avenue. This line formed the company's breakwater between the river and Randolph street at the time of the passage, April 16, 1869, of what is known as the Lake Front Act; which was passed by the legislature over the veto of the governor, and which is printed in full in the margin. Laws of 1869, p. 245.

In view of the important questions raised, and of the rights asserted, under that act, it is here given in full: [1]

---

[1] "An Act in relation to a portion of the submerged lands and Lake Park grounds, lying on and adjacent to the shore of Lake Michigan, on the eastern frontage of the city of Chicago.

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly,* That all right, title and interest of the State of Illinois in and to so much of fractional section fifteen (15), township thirty-nine (39), range fourteen (14) east of the third (3d) principal meridian, in the city of Chicago, county of Cook, and State of Illinois, as is situated east of Michigan Avenue and north of Park Row, and south of the south line of Monroe street, and west of a line running parallel with and four hundred feet east of the west line of said Michigan Avenue—being a strip of land four hundred feet in width, including said avenue along the shore of Lake Michigan, and partially submerged by the waters of said lake—are hereby granted, in fee, to the said city of Chicago, with full power and authority to sell and convey all of said tract east of said avenue, leaving said avenue ninety (90) feet in width, in such manner and upon such terms as the common council of said city may, by ordinance, provide: *Provided,* That no sale or conveyance of said property, or any part thereof, shall be valid unless the same be approved by a vote of not less than three-fourths of all the aldermen elect.

"§ 2. The proceeds of the sale of any and all of said lands shall be set aside, and shall constitute a fund, to be designated as the 'Park Fund' of

As early as May, 1869, the railroad company caused to be prepared a plan for an outer harbor at Chicago.

the said city of Chicago, and said fund shall be equitably distributed by the common council between the South Division, the West Division and the North Division of the said city, upon the basis of the assessed value of the taxable real estate of each of said divisions, and shall be applied to the purchase and improvement in each of said divisions, or in the vicinity thereof, of a public park, or parks, and for no other purpose whatsoever.

"§ 3. The right of the Illinois Central Railroad Company, under the grant from the State in its charter, which said grant constitutes a part of the consideration for which the said company pays to the State at least seven per cent of its gross earnings, and under and by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident to such grant, appropriation, occupancy, use and control in and to the lands submerged or otherwise lying east of the said line running parallel with and four hundred feet east of the west line of Michigan Avenue, in fractional sections ten (10) and fifteen (15), township and range as aforesaid, is hereby confirmed, and all the right and title of the State of Illinois in and to the submerged lands constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot twenty-one, south of and near to the round-house and machine shops of said company, in the South Division of the said city of Chicago, are hereby granted, in fee, to the said Illinois Central Railroad Company, its successors and assigns: *Provided, however*, That the fee to said lands shall be held by said company in perpetuity, and that the said company shall not have power to grant, sell or convey the fee to the same; and that all gross receipts from use, profits, leases or otherwise of said lands, or the improvements thereon, or that may hereafter be made thereon, shall form a part of the gross proceeds, receipts and income of the said Illinois Central Railroad Company, upon which said company shall forever pay into the State treasury, semi-annually, the per centum provided for in its charter, in accordance with the requirements of said charter: *And provided, also,* That nothing herein contained shall authorize obstructions to the Chicago harbor, or impair the public right of navigation; nor shall this act be construed to exempt the Illinois Central Railroad Company, its lessees or assigns, from any act of the General Assembly which may be hereafter passed regulating the rates of wharfage and dockage to be charged in said harbor: *And provided further,* That any of the lands hereby granted to the Illinois Central Railroad Company, and the improvements now, or which may hereafter be on the same, which shall hereafter be leased by said Illinois Central Railroad Company to any person or corporation, or which may hereafter be occupied by any person or corporation other than said Illinois Central Railroad Company, shall not, during the

On the 12th of July of the same year the Illinois Central Railroad Company, the Michigan Central Railroad Company,

---

continuance of such leasehold estate or of such occupancy, be exempt from municipal or other taxation.

"§ 4. All the right and title of the State of Illinois, in and to the lands, submerged or otherwise lying north of the south line of Monroe street, and south of the south line of Randolph street, and between the east line of Michigan Avenue and the track and roadway of the Illinois Central Railroad Company, and constituting parts of fractional sections ten (10) and fifteen (15) in said township thirty-nine (39), as aforesaid, are hereby granted, in fee, to the Illinois Central Railroad Company, the Chicago, Burlington and Quincy Railroad Company, and the Michigan Central Railroad Company, their successors and assigns, for the erection thereon of a passenger depot, and for such other purposes as the business of said company may require: *Provided,* That upon all gross receipts of the Illinois Central Railroad Company, from leases' of its interest in said grounds, or improvements thereon, or other uses of the same, the per centum provided for in the charter of said company shall forever be paid in conformity with the requirements of said charter.

"§ 5. In consideration of the grant to the said Illinois Central, Chicago, Burlington and Quincy, and Michigan Central Railroad Companies of the land as aforesaid, said companies are hereby required to pay to said city of Chicago the sum of eight hundred thousand dollars, to be paid in the following manner, viz.: two hundred thousand dollars within three months from and after the passage of this act; two hundred thousand dollars within six months from and after the passage of this act; two hundred thousand dollars within nine months from and after the passage of this act; two hundred thousand dollars within twelve months from and after the passage of this act; which said sums shall be placed in the Park Fund of the said city of Chicago, and shall be distributed in like manner as is hereinbefore provided for the distribution of the other funds which may be obtained by said city from the sale of the lands conveyed to it by this act.

"§ 6. The common council of the said city of Chicago is hereby authorized and empowered to quitclaim and release to the said Illinois Central Railroad Company, the Chicago, Burlington and Quincy Railroad Company, and the Michigan Central Railroad Company any and all claim and interest in and upon any and all of said land north of the south line of Monroe Street, as aforesaid, which the said city may have by virtue of any expenditures and improvements thereon or otherwise, and in case the said common council shall neglect or refuse thus to quitclaim and release to the said companies, as aforesaid, within four months from and after the passage of this act, then the said companies shall be discharged from all obligation to pay the balance remaining unpaid to said city.

"§ 7. The grants to the Illinois Central Railroad Company contained in this act are hereby declared to be upon the express condition that said

and the Chicago, Burlington and Quincy Railroad Company, by an agent, tendered to Walter Kimball, the comptroller of the city of Chicago, the sum of $200,000, as the first payment to the city under the fifth section of the act of 1869. He received the sum tendered upon the express condition that none of the city's rights be thereby waived, or its interest in any manner prejudiced, and placed the money in bank on special deposit, to await the action and direction of the common council. The matter being brought to the attention of that body, it adopted, June 13, 1870, a resolution, declaring that the city "will not recognize the act of Walter Kimball in receiving said money, as binding upon the city, and that the city will not receive any money from railroad companies, under said act of the General Assembly, until forced to do so by the courts." The city never quitclaimed or released, nor offered to quitclaim or release, to said companies or to either of them, any right, title, claim or interest in or to any of the land described in the act of 1869, nor was Kimball's act in receiving the money ever recognized by the city as binding upon it. On the expiration of his term of office he did not turn the money over to his successor in office, but kept it deposited in bank to his own individual credit, and so kept it until some time during the year 1874, or later, when, upon application by the railroad companies, he returned it to them. No other money than the $200,000 delivered to Kimball was ever tendered by the railroad companies, or either of them, to the city or to any of its officers.

At a meeting of the Board of Directors of the Illinois Central Railroad Company, held at the company's office in New York, July 6, 1870, a resolution was adopted to the effect "that this company accepts the grants under the act of the

Illinois Central Railroad Company shall perpetually pay into the Treasury of the State of Illinois the per centum on the gross or total proceeds, receipts or income derived from said road and branches stipulated in its charter, and also the per centum on the gross receipts of said company reserved in this act.

"§ 8. This act shall be a public act and in force from and after its passage."

legislature at its last session, and that the president give notice thereof to the State, and that the company has commenced work upon the shore of the lake at Chicago under the grants referred to." On the 17th of November, 1870, its president communicated a copy of this resolution to the Secretary of State of Illinois, and gave the notice therein required, adding: "You will please regard the above as an acceptance by this company of the above-mentioned law [Lake Front Act], and it is desired by said company that said acceptance shall remain permanently on file and of record in your office." The Secretary of State replied, under date of November 18, 1870: "Yours of the 17th inst., being a notice of the acceptance by the Illinois Central Railroad Company of the grants under an act of the legislature of Illinois, in force April 16, 1869, was this day received and filed and duly recorded in the records of this office."

Following these transactions were certain proceedings, commenced about July 1, 1871, by information filed in the Circuit Court of the United States for that District by the United States against the Illinois Central Railroad Company. That information set forth that Congress, in order to promote the convenience and safety of vessels navigating Lake Michigan, had, from time to time, appropriated and expended large sums of money in and about the mouth of Chicago River, and had constructed two piers extending from the north and south banks of that river eastwardly for a considerable distance into the lake; that, in July, 1870, it appropriated a large sum of money to construct an outer harbor at Chicago, in accordance with the plans of the Engineer Department of the United States; that the railroad company had, from time to time, wrongfully filled up with earth a portion of said lake, within said harbor; that what the company had then done, in that way, and what it intended to do, unless prevented, would materially interfere with the execution of the plan of improvement adopted by the War Department. A temporary injunction was issued against the company. Subsequently, in 1872, the parties to that suit entered into a stipulation, from which it appears that the matters referred to in said information,

relating to the construction of docks and wharves in the basin or outer harbor of the city, formed by the breakwater then in process of erection by the United States, were referred to the War Department, and that the Secretary, upon the recommendation of engineer officers, approved certain lines, limiting the construction of docks and wharves in said outer harbor, to wit: commencing at the pier on the south side of the entrance to the Chicago River, 1200 feet west of the government breakwater; thence south to an intersection with the north line of Randolph street extended eastwardly; thence due west 800 feet; and thence south to the east and west breakwater proposed to be constructed by the United States 4000 feet south of the pier first above mentioned, the line so established being fixed as the line to which docks and wharves may be extended by parties entitled to construct them within said outer harbor. The railroad company desiring to proceed, under the supervision of the Engineer Bureau of the United States, with the construction of docks and wharves within the proposed outer harbor, between the pier on the south side of the entrance to Chicago River and the north line of Randolph street, extended eastwardly in conformity with the said limiting lines, and having agreed to observe said lines, as well as the directions which might be given, in reference to the construction of said docks and wharves, by the proper officers of said bureau, the injunctional order, pursuant to stipulation between the parties, was, January 16, 1872, vacated, and the information dismissed, with leave to the United States to reinstate the same upon the failure of the company, in good faith, to observe the said conditions.

Subsequently, the railroad company resumed work on, and, during the year 1873, completed, Pier No. 1 adjacent to the river and east of the breakwater of 1869.

On the 15th of April, 1873, the legislature of Illinois passed the following act, which was in force from and after July 1, 1873:

"§ 1. *Be it enacted, etc.,* That the act entitled 'An act in relation to a portion of the submerged lands and Lake Park grounds lying on and adjacent to the shore of Lake Michigan,

on the eastern frontage of the city of Chicago,' in force April 16, 1869, be and the same is hereby repealed." Ill. Laws of 1873, 115.

In 1880 and 1881 Piers Nos. 2 and 3, north of Randolph street, were constructed in conformity with plans submitted to and approved by the War Department.

The common council of Chicago, by ordinance approved July 12, 1881, extended Randolph street eastwardly, and declared it to be a public street, from its then eastern terminus " to the west line of the right of way of the Illinois Central Railroad Company, as established by the ordinance of September 10, 1855, . . . and also straight eastwardly . . . . from the easterly line of Slip C, produced southerly to Lake Michigan;" giving permission to the company to construct and maintain at its own expense, within the line of Randolph street so extended and over the company's tracks and right of way, a bridge or viaduct, with suitable approaches, to be approved by the Commissioners of Public Works, which should be forever free to the public and to all persons having occasion to pass and repass thereon. Such a bridge or viaduct was necessary in order that the piers constructed and in process of construction east of the breakwater of 1869 might be conveniently reached by teams. The viaduct was built in 1881, and extends to the base of Pier 3. It has ever since been used by the public.

It appears from the evidence that in 1882, the pier, which was built in 1870 from Twelfth street to the north line, extended, of lot 21, was continued as far south as the centre line of Sixteenth street. The main object of this extension, according to the showing made by the company, was to protect the tracks from the waves during storms from the northeast. Another object was to construct a slip or basin south of the south line of lot 21, between the breakwater and the shore, where vessels loaded with materials for the company, or having freight to be handled, could enter and be in safety. In 1885, a pier was constructed by the company at the foot of Thirteenth street, according to a plan submitted to the War Department; and the department did not object to its construction, "provided

no change be made in its location and length." The pier, as constructed, does not differ from that proposed and approved, except that it is wider by fifty feet. But it does not appear that the War Department regards that change in the plan as injurious to navigation, or as interfering with the plans of the government for an outer harbor.

At the hearing in the court below, a map was used for the purpose of showing the different works constructed by the United States; the location of all the structures and buildings erected by the railroad company, with the date of their erection; and the relation of the tracks and breakwaters of the company to the shore as it now is, and, to some extent, as it was heretofore.

That map, known as the Morehouse map, and called C, is substantially reproduced on page 413.

The State, in the original suit, asks a decree establishing and confirming its title to the bed of Lake Michigan, and its sole and exclusive right to develop the harbor of Chicago, by the construction of docks, wharves, etc., as against the claim by the railroad company that it has an absolute title to said submerged lands, described in the act of 1869, and the right — subject to the paramount authority of the United States in respect to the regulation of commerce between the States — to fill the bed of the lake, for the purposes of its business, east of and adjoining the premises between the river and the north line of Randolph street, and also north of the south line of Lot 21; and, also, the right, by constructing and maintaining wharves, docks, piers, etc., to improve the shore of the lake, for the purposes of its business, and for the promotion, generally, of commerce and navigation. The State, insisting that the company has, without right, erected, and proposes to continue to erect, wharves, piers, etc., upon the domain of the State, asks that such unlawful structures be directed to be removed, and the company enjoined from constructing others.

The city, by its cross-bill, insists that since June 7, 1839, when the map of Fort Dearborn addition was recorded, it has had the control and use for public purposes of that part of section 10 which lies east of Michigan Avenue and between

MAP C.

Randolph street and fractional section fifteen; and that, as successor of the town of Chicago, it has had possession and control since June 13, 1836, when the map of Fractional Section 15 Addition was recorded, of the lands in that Addition north of block 23. It asks a decree declaring that it is the owner in fee, and of the riparian rights thereunto appertaining, of all said lands, and has under existing legislation, the exclusive right to develop the harbor of Chicago by the construction of docks, wharves and levees, and to dispose of the same by lease or otherwise as authorized by law; and that the railroad company be enjoined from interfering with its said rights and ownership.

The railroad company, the State and the city, each appealed from the final decree.

In the arguments, some points were taken and many cases cited thereto, which are not noticed or referred to in the opinion of the court *infra*.

*Mr. Benjamin F. Ayer* for the Illinois Central Railroad Company.

I. The railroad company is charged in the information with an invasion of the proprietary interest of the State in the bed of the lake. The encroachments complained of are upon the *jus privatum* or right of property asserted by the State, and not upon the *jus publicum* or governmental control over navigable waters vested in the State for public purposes. There is a broad distinction between a violation of the public right in navigable waters and an invasion of the proprietary interest of the sovereign. The one creates a public nuisance; the other a purpresture.

II. The complainants allege and the respondent admits, that upon the admission of Illinois into the Union in 1818 the title to the bed of Lake Michigan, or so much of it as lies within the boundaries of the State, became vested in the State.

Upon the separation of the British Colonies in America from the mother country, they succeeded as sovereign States to the title of the crown in the tide waters within their terri-

ILLINOIS CENTRAL RAILROAD v. ILLINOIS. 415

Mr. Ayer's Argument for the Illinois Central Railroad Company.

torial limits. Both the *jus publicum* and the *jus privatum*, which before then had been vested in the crown and parliament, or in the local governments established under the royal sanction, became vested in the several States. They acquired not only the ownership of the soil under navigable waters, but also the legislative authority to regulate and control the rights of the public. All the prerogatives and powers which before belonged either to the crown or parliament, became immediately vested in the State. *Martin* v. *Waddell*, 16 Pet. 367; *Smith* v. *Maryland*, 18 How. 71; *Commonwealth* v. *Alger*, 7 Cush. 53; *Nichols* v. *Boston*, 98 Mass. 39; *S. C.* 93 Am. Dec. 132; *People* v. *New York & Staten Island Ferry Co.*, 68 N. Y. 71; *Langdon* v. *Mayor of New York*, 93 N. Y. 129; *Stevens* v. *Patterson and Newark Railroad*, 34 N. J. Law (5 Vroom) 532.

The foregoing cases relate to lands under tide waters; but the principles enunciated are equally applicable to navigable waters above the flow of the tide. *St. Clair County* v. *Lovingston*, 23 Wall. 46; *Barney* v. *Keokuk*, 94 U. S. 324; *Packer* v. *Bird*, 137 U. S. 661; *Hardin* v. *Jordan*, 140 U. S. 371.

III. The Illinois Central Railroad Company was authorized and required by its charter to lay out and construct a railroad *into* the city of Chicago. To aid in building the road, extensive grants of land were made by the State to the Company — among them, the following: "SEC. 3. The said corporation shall have right of way upon, *and may appropriate to its sole use and control* for the purposes contemplated herein, land not exceeding two hundred feet in width, through its entire length: may enter upon and take possession of and use all and singular any lands, streams and materials of every kind, for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, . . . station grounds, . . . turn-outs, engine-houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges belonging to the State, are hereby granted to said corporation for said purposes."

The effect of these words is obviously to invest the company with a complete title to all the lands belonging to the State, which should be required and taken for the purposes mentioned. *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672, 680; *Van Ness* v. *Washington*, 4 Pet. 232, 284.

The right of the company to appropriate to its use the lands of the State, is coëxtensive with the power conferred by the same section of the charter to acquire by purchase or condemnation the lands of private owners. The latter is a continuing power which may be exercised from time to time as the necessities of the company may require. *Chicago and West. Indiana Railroad* v. *Illinois Central Railroad*, 113 Illinois, 156 ; *Chicago, Burlington &c. Railroad* v. *Wilson*, 17 Illinois, 123; *N. Y. & Harlem Railroad* v. *Kip*, 46 N. Y. 546.

IV. The consent of the common council of Chicago to the location of the railroad within the city, was required by the eighth section of the company's charter. An ordinance granting that consent was passed June 14, 1852, and a formal contract under seal was entered into between the railroad company and the city, in which it was covenanted that the ordinance should be of perpetual obligation, and that each party would abide by and perform all the obligations therein contained according to the true intent and meaning thereof. The assent was given on conditions which were extremely burdensome, but they have been fully complied with. The railroad was located and built in the open waters of the lake in front of fractional sections ten and fifteen, as directed by the common council; and the company had been in peaceable possession of the grounds appropriated for that purpose, with the exception of a strip one hundred feet in width on the east side of the railroad tracks, for thirty years before the commencement of this suit. The proof shows that the ordinance was accepted by the railroad company. The company did not immediately occupy all the land described; but the title to land is not lost by leaving it in its natural state without improvement. *Potomac Steamboat Co.* v. *Upper Potomac*

ILLINOIS CENTRAL RAILROAD *v.* ILLINOIS.  417

Mr. Ayer's Argument for the Illinois Central Railroad Company.

*Steamboat Co.*, 109 U. S. 672, 684; *Boston* v. *Lecraw*, 17 How. 426, 436; *Barclay* v. *Howell's Lessee*, 6 Pet. 498, 504, 505.

The company took possession of so much of the land as was then needed. When more became necessary for the proper conduct of its business, it attempted to take possession of the rest, and was prevented, not by the interference of the city — for the city did not object — but by the action of the War Department which has control of the harbor. That there was any election by the company to relinquish the right to the additional one hundred feet, or that the company is in any way estopped from claiming its rights against the city and State, is a conclusion, we respectfully submit. not warranted by any evidence in the record.

V. The railroad company's title to all the land it had reclaimed from the lake lying east of the west line of the railway in fractional sections ten and fifteen, was confirmed by the act of April 16, 1869. A confirmation by a law, is as fully to all intents and purposes a grant, as if it contained in terms a grant *de novo*. *Strother* v. *Lucas*, 12 Pet. 410; *Grignon's Lessee* v. *Astor*, 2 How. 319; *Ryan* v. *Carter*, 93 U. S. 78; *Morrow* v. *Whitney*, 95 U. S. 551.

VI. By the same act a further grant was made to the railroad company in the following terms: "All the right and title of the State of Illinois in and to the submerged land constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company, for the distance of one mile and between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot 21, south of and near to the round-house and machine shops of said company in the south division of the city of Chicago, are hereby granted, in fee, to the Illinois Central Railroad Company, its successors and assigns."

It is manifest that the legislature intended to transfer, by this act, all the proprietary interest which the State had in the granted premises to the railroad company. The words used in the granting clause are words of present grant, and import an immediate transfer of title. There is no subsequent re-

straining clause. The language admits, therefore, of no other interpretation. *Schulenberg* v. *Harriman*, 21 Wall. 44; *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733; *Railroad Company* v. *Baldwin*, 103 U. S. 426; *Wright* v. *Roseberry*, 121 U. S. 488; *Deseret Salt Co.* v. *Tarpey*, 142 U. S. 241. The title of the State became completely extinguished, and the entire estate in the land, subject only to the conditions annexed to the grant, became vested in the railroad company.

VII. The repeal of the act of April 16, 1869, did not divest the title which had become vested in the railroad company. Private rights which have vested under a legislative act are not affected by a repeal of the law, and cannot be annulled by subsequent legislation. A State does not possess the power of revoking its own grants.

It has been for more than eighty years the settled doctrine of this court, that a grant of land made by a State and accepted by the grantee is an executed contract, within the protection of that clause of the Constitution of the United States, which declares that no State shall pass any law impairing the obligation of contracts. *Fletcher* v. *Peck*, 6 Cranch, 87.

The right to acquire property, and to be secure in the enjoyment of it when lawfully acquired, has been placed beyond legislative encroachment everywhere in the United States. In some form of words, the constitution of every State contains a provision, that "no person shall be deprived of life, liberty or property, without due process of law"; and since the adoption of the Fourteenth Amendment in 1868, the same check on the abuse of legislative power has been provided by the Constitution of the United States. That railroad corporations are within the purview of this provision is settled by repeated decisions of this court. *Santa Clara County* v. *Southern Pacific Railroad*, 118 U. S. 394; *Minneapolis & St. Louis Railway* v. *Beckwith*, 129 U. S. 26; *Charlotte, Columbia &c. Railroad* v. *Gibbes*, 142 U. S. 386.

The act of April 16, 1869, was repealed on the 15th of April, 1873. During the intervening period of four years the

title to the land in controversy was vested in the railroad company. The company still holds the title, unless it shall be held that the repealing act was " due process of law."

*Mr. John S. Miller* for the City of Chicago.

It is a matter of common knowledge that large expenditures have been made by the city of Chicago in the improvement of its harbor, the United States not having appropriated or spent any money for this harbor west of the Rush street bridge, which is near the mouth of the river, *Escanaba Co.* v. *Chicago,* 107 U. S. 678, and that the State of Illinois has never spent any money for that purpose.

The city has, in addition to its property interests upon the lake front, an interest and standing herein to protect and conserve this great harbor from encroachment and appropriation to private uses.

It is also the owner in fee, in trust for public uses, of the public grounds in section 10, south of the north line of Randolph street, upon the shore of the lake, and in section 15, known as Lake Park, and as such is entitled to the rights of riparian owner. The invasion of the shore upon this public ground south of Randolph street was the result of building the government piers at the mouth of the river. The natural effect of the waters, unaffected by these artificial causes, was to cause accretions along this front, but the current created by the construction of these piers and the turning off of the effect of storms, caused avulsion by which the shore was not imperceptibly, but perceptibly and suddenly carried away.

This invasion of the water up to 1852, when the Illinois Central Railroad was constructed, had not changed the ownership. *Boston* v. *Lecraw,* 17 How. 426; *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.,* 109 U. S. 672. And this fact was recognized by the railroad company as well as by the city, in the ordinance of June 14, 1852, and the agreement made in pursuance thereof.

The city, being thus the owner of the shore, has all rights

of a riparian owner and its ownership includes any additions to the shore made by natural accretions or by art or industry. *Barclay* v. *Howell*, 6 Pet. 498; *New Orleans* v. *United States*, 10 Pet. 662, 717; *Barney* v. *Keokuk*, 94 U. S. 324; *Godfrey* v. *Alton*, 12 Illinois, 29; *S. C.* 52 Am. Dec. 476; *Chicago Dock & Canal Co.* v. *Kinzie*, 93 Illinois, 415.

. The grant to the city of the power to establish wharves and slips was in aid of commerce and navigation, and was, by necessary implication, a grant of the lands upon which such wharves and slips might be established, such grant taking effect when structures of that kind were erected. *Williams* v. *Mayor*, 105 N. Y. 436. The same may be said of the grant of power to the city by the act of 1847, to build the breakwater. Such riparian right is property right which is within constitutional protection. *Yates* v. *Milwaukee*, 10 Wall. 497; *Dutton* v. *Strong*, 1 Black, 23; *Railway Co.* v. *Renwick*, 102 U. S. 180; *Railroad* v. *Schurmeir*, 7 Wall. 272. And it would not be competent for the legislature to grant away the adjacent soil under the lake to a private person or corporation, and thus cut off the riparian right of the shore owner. This adjacency and access, and the right to maintain them to his advantage, and to preserve and improve them, and the enjoyment of the land, and of the navigable water in connection therewith, is of the essence of this riparian right. *Stevens* v. *Patterson & Newark Railroad*, 34 N. J. L. (5 Vroom,) 532; *Keyport Case*, 3 C. E. Green, (18 N. J. Eq.) 516; *Lyon* v. *Fishmongers' Co.*, 1 App. Cas. 662, 672; *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672, 683.

By the contract made by the railroad company with the city by the ordinance of June 14, 1852, and the agreement of March 28, 1853, the city and property owners acquired rights in furtherance of the special use to which this property was devoted, which could not be impaired. They got the breakwater or barrier along the shore, fixing the shore line and protecting this trust property from encroachment. And the city, as riparian proprietor, had implied authority to erect wharves along the broad street, levee or public ground upon the shore, which was dedicated for the purpose of a landing-

place as well as a street by authority of the State, and, it would seem, had, incidentally, the right to charge a compensation for their use. *Atlee* v. *Packet Co.*, 21 Wall. 389. It is clear that the legislature could not grant a way to the Illinois Central Railroad Company over the soils under the navigable waters of the harbor in front of this ground.

If the rights of the city and its inhabitants in this lake front ground and in the harbor in front thereof are not within the constitutional protection because they are public, how much more is that true of the subject-matter of the act of 1869 ? The subject-matter of that act, and of the alleged grant thereby made to the Illinois Central Railroad Company, was strictly *publici juris*. The bed of Lake Michigan, so far as the same is not affected with the rights of the riparian owner, is held by the people of the State of Illinois in their sovereign capacity, and *de communi jure*, and wholly in trust for the public, and for the public uses, for which it is adapted. And the same was not held by the State in any proprietary or private right or as its demesne, and was not as to a large tract, extending a mile into the deep water of the open lake, and composing the outer harbor, and entrance to the inner harbor of a great commercial city, the subject of a private grant or contract.

The doctrine which draws a distinction between a *jus privatum* and a *jus publicum*, or a dividing the ownership or right of the sovereign in the bed of navigable waters into a private right and a public right, which is alleged to have existed in the law of England, can have no place in our institutions. The rights of the people of the State in this country — their sovereignty and jurisdiction over the waters — are not governed by the common law of England as it prevailed in the colonies before the Revolution, but as modified by our own institutions. *Martin* v. *Waddell's Lessee*, 16 Pet. 367, 410 ; *Pollard's Lessee* v. *Hagan*, 3 How. 212, 229.

The ownership by the people of the State of the soils under navigable waters is, in its nature, entirely different from the title to the public lands or the demesne of the sovereign or State. That is not only shown by what is above said, and the

authorities quoted, but is emphasized by this court in *Pollard's Lessee* v. *Hagan*, 3 How. 212, and *Weber* v. *Harbor Commissioners*, 18 Wall. 57.

It must be clear, therefore, that in this country the right or ownership of the people of the State in the soils under navigable waters is wholly *jus publicum* and in trust for public uses.

And further, at the time of the passage of the act of 1869, no docks or wharves could be permitted to extend into the lake more than 1300 feet (where the line was established by the engineers of the United States in 1871,) without seriously encroaching upon the public right of navigation. This must be held to have been known at the time of the passage of that act. The United States government breakwater, which was built as an outside breakwater, to enclose and protect the harbor of refuge from the violence of the lake, is about three-fifths of a mile from the shore, and the dock line established by the United States engineers as the limit beyond which docks should not be built, between which and the shore there would be slips in which vessels could enter and ride, is about 1300 feet east of the shore. The water at this point is not within an arm of the lake ; there are not points or projections of land within which these waters were enclosed; this entire one and four-fifths square miles of the bed of Lake Michigan was under the open, deep navigable waters of the lake. It was a public port, and as such free by the common law.

It does not help the case of the railroad company herein to say that the British Parliament might have made such a grant, and that the legislature of Illinois has in that respect, all the powers of parliament. Parliament never did make such a grant. And if parliament could make the grant under the English constitution, so by its same absolute power it could take it away. Parliament therefore could not make such an irrevocable grant as the railroad company here claims.

Neither did the act of April 16, 1869, constitute a contract between the State and the railroad company within the meaning and protection of section 10, article 1, of the Constitution of the United States, prohibiting the passage of laws impairing

the obligations of contracts.  It did not invest the company with such property rights in the soil and bed of the lake in the harbor of the city of Chicago, which is covered by the act, as is within the meaning and protection of the Fourteenth Amendment to the Constitution.  The act, if sustainable as valid, can be sustained only because it invested the railroad company with certain strictly public powers and trusts as a public agency and for the public good.  Being without consideration, it was a mere license, revocable at the will of the legislature, if it authorized the railroad company to make any private use of the bed of the lake.  It was purely voluntary. It created no obligation on the part of the railroad company.

The charter of the railroad company and this act of 1869 are to be strictly construed against the railroad company, and to give nothing by an implication which is not necessary and unavoidable.  Grants of the sovereign are to be construed strictly against the grantee; they are not to be understood as diminishing its rights beyond what is taken away by necessary and unavoidable construction.  *The Rebeckah,* 1 C. Rob. 230, *per* Lord Stowell.  *Monroe* v. *Commissioners,* 2 Black, 720; *Bridge Proprietors* v. *Hoboken Co.,* 1 Wall, 116; *Rice* v. *Railroad Co.,* 1 Black, 358.

It follows that the repealing act of April 15, 1873, was valid, as to the entire act of 1869.  Moreover, if the act of 1869 could, upon a proper construction be held to give the railroad company any beneficial right, that right extinguishing or affecting the public right, arises from the exercise by the legislature of the police power over the public use of navigable waters, for the public welfare, and is revocable.  And the repealing act is the exercise of the police power.  *Commonwealth* v. *Alger,* 7 Cush. 53, 95.  The soil under navigable waters being held by the people of the State, *de jure communi,* in trust for the common use, as a portion of their inherent sovereignty, any act of legislation affecting their use relates to the *jus publicum,* and affects the public welfare; and is, therefore, the exercise of the police power.

*Mr. S. S. Gregory* for the city of Chicago.

By section 3 of the railroad company's charter, it was provided that the corporation should have the "right of way upon and may appropriate to its sole use and control for the purposes contemplated herein, land not exceeding two hundred feet in width through its entire length; may enter upon and take possession of, and use all and singular any lands, streams and materials of every kind, for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil banks, turnouts, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges belonging to the State, are hereby granted to said corporation for said purposes."

Having regard to the rules of construction which apply to the grant of corporate powers and privileges from the State, it cannot be successfully maintained that this provision in the charter would confer any right upon the corporation to invade the bed or waters of Lake Michigan, of its track in Lake Michigan or upon its bed. The section concludes with a proviso against any construction of the act which would warrant the company in interrupting the navigation of "said streams."

It is quite apparent, also, that this charter contemplated that the railroad company should take a right of way upon land not exceeding two hundred feet in width, and that the grant of land, waters, etc., belonging to the State to the corporation was for such purpose — namely, the right of way and use and control for the purpose of a railroad, as contemplated by the charter.

Between Randolph street and Park Row the railroad company has, therefore, merely a right of way under its charter.

Prior to this location, the territory being concededly within the corporate limits of the city of Chicago, the railroad company applied for and obtained the consent of its common council to the location of its road within the city limits, and entered into an agreement with that body, dated the 28th of March, 1853, accepting a location, three hundred feet in width, from the southern boundary of the public ground near Twelfth

street to the northern line of Randolph street." The company did not see fit to avail itself of a right of way to the full width of three hundred feet, but, on the contrary took a right of way of two hundred feet, and constructed its breakwater or shore protection two hundred feet east from the western line of its right of way instead of three hundred feet, as it might have done under the ordinance, though not under its charter, and it has since continued to use this right of way as thus limited and defined.

It is not, therefore, true that the railroad company was the owner of the fee of this right of way, as was argued in the court below, and may perhaps be argued in this court. It had merely an easement or right of way in this land, which neither conferred any riparian right upon the railroad, nor affected such right in the owner of the land over which the right of way extended. *Banks* v. *Ogden*, 2 Wall. 57. The riparian right was in the city.

It would seem obvious that a fair construction of the charter powers of the city would include a right to build wharves on the lake front, or the east side, if it may be so called, of Michigan Avenue. That seems to be the clear purport of the decision of this court in *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672. There was a legislative purpose to effectuate the dedication of this public grant as a water front or public landing place, authority to improve which was to be vested in the city, and full municipal control over which and the adjacent harbor was to be committed to the city.

If it be conceded that these rights in the city are held at the pleasure of the legislature, then it may be said, to that extent anticipating the course of the argument, that if the act of 1869 be construed as devolving similar rights and privileges upon the railroad company as another or substituted public agency, and thus withdrawing them from the city, the company should be considered to hold those rights upon the same tenure as that of the city, prior to this substitution; and the grant in fee of the bed of the lake is to be regarded wholly as in aid of the right to dock and wharf, expressing

only what, by necessary implication, would have passed without formal grant.

It is not contended that these lot owners have strictly and technically riparian rights in the premises, but they are beneficiaries of the trust created by the dedication, and have a right to insist, as held by this court, upon its specific execution. *Barclay* v. *Howell's Lessee*, 6 Pet. 498. The rights of abutting lot owners to insist upon the appropriation of property dedicated to a specific public use in accordance with such dedication is fully recognized in the following cases: *Trustees* v. *Walsh*, 57 Illinois, 363, 369; *Maywood Co.* v. *Maywood*, 118 Illinois, 61, 72; *Jacksonville* v. *Jacksonville Railway*, 67 Illinois, 540; *Moose* v. *Carson*, 104 N. Car. 431; *Zinc Co.* v. *La Salle*, 117 Illinois, 411; *Cincinnati* v. *White's Lessee*, 6 Pet. 431; *Barney* v. *Keokuk*, 94 U. S. 324, 339, 340, 342.

The right of a State to hold the soil under its navigable waters for all municipal purposes is exclusive. If it holds title to such lands upon trusts for public use, it may be that it has power to release to an individual or a corporation such title as it has, not thereby emancipating the trust estate from the execution of the trust with which it stands charged, but substituting its grantee as the trustee of this trust. Such would be the effect of legislation authorizing any other public agency, as the city of Chicago, or perhaps the railroad company, to undertake the construction of wharves and docks in aid of navigation, and in execution of the public trust, subject to which title to the land under navigable waters rests in the State. But to say this is far from saying that the State as proprietor, or the legislature of a State by law in the exercise of plenary legislative power, such as is enjoyed by the parliament of England, may grant title to the bed of navigable waters. In so far as such grant is made in aid of navigation, as by way of granting flats which are an obstacle to navigation, or of shore privileges, the exercise of which is a positive aid to navigation, the State acts clearly within its duty as trustee for the great public trust attaching to its title.

As a proprietor in the sense in which it is the proprietor of lands, title to which rests in the State for the purpose of sale

and disposition, it has no title whatever to the bed of water actually navigable and required for the purposes of navigation. Its interest, while referred to in the case cited as proprietary, is essentially sovereign and municipal. It is not the subject of grant but of regulation by law, and disposition by law is not unrestrained as is the case in England, but in so far as attempted in derogation of the trust for public navigation, is absolutely prohibited by the commerce clause of the Federal Constitution.

Probably the history of American jurisprudence will not reveal a case in which an attempt by the State to abdicate its sovereign title to the bed of a great extent of navigable water manifestly required for the purposes of commerce and navigation, has been either made by a legislature or sanctioned by the courts. Treated as a grant by a proprietor such legislation would be inoperative because the grantor has no such title as he attempts to convey. Treated as an exercise of sovereign legislative power it would be absolutely void as a positive infraction of the Federal Constitution. No such attempt was made in this case, and no reasonable construction of the legislative act under review will permit counsel justly to tax the legislature of Illinois with such a wanton abuse of power and gross breach of high and important public trust.

All the cases establish that although the State may have in a sense a measure of proprietary right in the bed of navigable waters within its boundaries, that right pertains to sovereignty, and a grant thereof confers no such dominion or ownership upon the grantee as a grant of public lands of the State subject to disposition. Such right is also qualified by the riparian rights of shore owners which do not at all depend upon ownership of the bed of the water. Such riparian right is a valuable property right which cannot be taken or impaired by the State without compensation. This principle is firmly established in this country by the adjudications of this court and by the great weight of modern authority. *Dutton* v. *Strong,* 1 Black, 213 ; *Railroad Co.* v. *Schurmeir,* 7 Wall. 272 ; *Yates* v. *Milwaukee,* 10 Wall. 497 ; *Weber* v. *Harbor Commissioners,*

18 Wall. 57; *St. Louis* v. *Rutz*, 138 U. S. 236; *Union Depot Co.* v. *Brunswick*, 31 Minnesota, 297; *Miller* v. *Mendenhall*, 43 Minnesota, 95; *Burton* v. *Richardson*, 105 Mass. 351; *Rumsey* v. *New York & New England Railroad*, 133 N. Y. 79.

The grant by the State to the railroad company was wholly gratuitous. When, in the exercise of legislative discretion, it appeared that those public purposes, regard for which suggested the gift of these powers to the railroad company, might be better served by their withdrawal, it was clearly competent for the legislature, having due regard for such property rights as had attached to the subject of their gift in the interval, to resume the subject of its license and to permit the city to control these essentially public and municipal franchises.

Neither the provisions of the Fourteenth Amendment, nor that clause in the Federal Constitution which forbids a State from passing a law to impair the obligation of contracts in anywise affect this exercise of legislative discretion.

The State did not attempt to convey the fee to the bed of the lake, in derogation of the public right of navigation. Its sovereign or legislative right to convey the bed of water actually navigable is clearly limited by the clause in the Constitution conferring upon Congress the power to regulate commerce. Subject to this clause its plenary power to grant the bed of the lake, adjacent to the shore, in aid of commerce and navigation must be conceded, subject also, however, to the right of the State, by subsequent legislation, to regulate and control the use to which property so bestowed might be put by the grantee.

The constitutional questions involved in this case arise on a consideration of the validity and effect of the repealing act of April 15, 1873. The company had no property rights under the act of 1869, except in so far as it acted thereunder and filled in the waters of Lake Michigan, and built wharves and other erections thereon in accordance with the permission therein contained. To the extent that its property rights actually attached, it was fully protected by the decree of the

Circuit Court. *Attorney General* v. *Boston & Lowell Railroad,* 118 Mass. 345.

*Mr. George Hunt,* Attorney General of the State, for the State of Illinois.

I. The lake front act was never passed by the legislature.

II. The subject of that act was not expressed in its title.

III. The railroad company had no power to hold the submerged lands. *Ill. Cent. Railroad* v. *The People,* 119 Illinois, 137; *In re Swigert,* 119 Illinois, 83.

IV. The constitution of 1870 repealed all existing charters or grants of special privileges to corporations, which were not accepted within ten days after the new constitution took effect.

V. There was no acceptance of any additional corporate powers under the lake front act within the time limited by the constitution.

VI. Under the constitution of 1848 it was not competent for the General Assembly to grant to the Illinois Central Company the title to the land in question by a mere legislative act, without the approval of the governor.

VII. No right was conferred upon the railroad company by its charter to use the harbor for railroad purposes. *St. Louis &c. Railroad* v. *Trustees,* 43 Illinois, 303.

VIII. The act of 1869 by its confirmatory clause conferred no new right. *Illinois Central Railroad* v. *Irwin,* 72 Illinois, 452.

IX. The right to construct wharves and piers in the navigable waters of a public harbor does not pass with a grant of the submerged land. The authority and duty of the city to develop the harbor by the extension of streets and piers has not therefore been taken away, nor has it been deprived of its riparian rights as owner of the public ground in front of the harbor. *People* v. *Ferry Co.,* 68 N. Y. 71; *Langdon* v. *New York City,* 93 N. Y. 144.

X. The right to wharf and construct piers in the harbor not passing with the grant of the submerged land, does not arise

by implication from the words of the proviso, and that implication is not of sufficient force to deprive the city of its power to extend streets as piers, and to take away the riparian rights of the shore owners. *Perrine* v. *Chesapeake & Delaware Canal*, 9 How. 172.

XI. The right to wharf in the harbor, even if given by the act of 1869, was revocable, and was recalled by the repealing act of 1873.

XII. The State of Illinois did not possess the power to grant these submerged lands, underlying the harbor of a great city, to a railroad corporation. *Martin* v. *Waddell*, 16 Pet. 367.

XIII. Whatever wharfing rights and franchises may have passed by the act of 1869 were recalled by its repeal, because they were supplementary, and not original privileges, and such grants and privileges create no contract protected by the Federal Constitution. *Salt Company* v. *East Saginaw*, 13 Wall. 373.

*Mr. John N. Jewett* closed, for the Illinois Central Railroad Company.

I. The common law doctrine in respect to the ownership, control and right of disposition of land under tide waters prevails in this country and is, by repeated decisions of this court, made applicable to the bodies of fresh water, denominated "Great Navigable Lakes," which are treated as "Inland Seas." The rule in respect of all such bodies of water is, that the title and right of disposition of the land under the waters within their respective jurisdictions, are vested in the several States by virtue of their sovereignty as such States. *Manchester* v. *Massachusetts*, 139 U. S. 240; *Smith* v. *Maryland*, 18 How. 71; *McCready* v. *Virginia*, 94 U. S. 391; *Martin* v. *Waddell*, 16 Pet. 367; *Hardin* v. *Jordan*, 140 U. S. 371; *Goodtitle* v. *Kibbe*, 9 How. 471; *Doe* v. *Beebe*, 13 How. 25; *Pollard's Lessee* v. *Hagan*, 3 How. 212; *Mumford* v. *Wardwell*, 6 Wall. 423; *Weber* v. *Harbor Commissioners*, 18 Wall. 57; *St. Clair County* v. *Lovingston*, 23 Wall. 68; *Barney* v. *Keokuk*, 94 U. S. 324; *The Genessee Chief*, 12 How. 443.

II. The riparian owner, in the absence of restrictive legis-

lation, has the right to connect his shore line, by means of wharves, piers or docks, constructed in the shallow waters immediately bordering upon his land, with the waters which are navigable in fact, in his own interest as well as in the interest of the public. *Yates* v. *Milwaukee*, 10 Wall. 497; *Weber* v. *Harbor Commissioners*, 18 Wall. 57; *Dutton* v. *Strong*, 1 Black, 23; *Railroad Company* v. *Schurmeir*, 7 Wall. 272.

III. The making and recording of the maps and plats of the "Fort Dearborn Addition to Chicago," by authority of the United States, and the sale and conveyance of all the lots designated upon that map or plat, divested the United States of all jurisdiction and authority over the land so subdivided and sold, and of the incidents of ownership pertaining to the lands. The sovereignty and jurisdiction thereby passed to the State of Illinois, the ownership of the lots conveyed, to the purchasers, and the title to the streets, alleys and public grounds designated on the plat, to the municipal corporation of Chicago, in trust for the use of the public. Every act of the city within these powers absolutely accomplished, the State should respect. Every power of agency, unexecuted, is subject to revocation, either expressly or by implication. *East Hartford* v. *Hartford Bridge Co.*, 10 How. 511; *Von Hoffman* v. *Quincy*, 4 Wall. 535.

IV. The making and recording of the plats of fractional section 15 addition to Chicago, and of Fort Dearborn addition to Chicago, and the sale of all the lots in those additions, in accordance with those plats, divested the former owners, although they were the State in one case, and the United States in the other case, of all their right, title and estate as individual proprietors in said additions, including the streets and public grounds; and the sovereignty and jurisdiction of the United States over the land comprising Fort Dearborn addition, was by the plat and the record of it and the sale of the lots, absolutely extinguished. In the making and recording of sheet plats, the State and the United States were acting as private owners, and subject to the law to the same extent that a citizen would be. *New Orleans* v. *United States*, 10 Pet. 662, 710.

V. The act of the general assembly of April 16, 1869, entitled "An act in relation to a portion of the submerged lands and Lake Park grounds, lying on and adjacent to the shore of Lake Michigan on the eastern frontage of the city of Chicago" and commonly known as "the Lake Front act," was a valid act of legislation, passed in a constitutional way. Due effect must therefore be given to it as such. To this extent the opinion of Mr. Justice Harlan, and the decree entered by his direction in this case, support the contention of the Illinois Central Railroad Company. See also *Schuyler County* v. *The People*, 25 Illinois, 181; *Wabash Railway* v. *Hughes*, 38 Illinois, 174.

VI. The Illinois Central Railroad Company was in no need of "the Lake Front Act" as a confirmatory act. Its rights, so far as covered by the act, as a confirmatory one, were fully protected by its original charter. The confirmation was a recognition of its existing rights. A grant, originally complete, is not made stronger by a subsequent confirmation. Still, accepting the act of confirmation, with all its consequences, it is respectfully insisted that confirmation of existing rights was not the chief purpose of the act itself. This may be safely assumed from its positive provisions.

VII. The Lake Front act, coupled with the acceptance of it, made a completed grant, in accordance with its terms, taking effect *in presenti*. No further act on the part of the State was required, nor was it necessary to perfect the grant. *Rutherford* v. *Greene*, 2 Wheat. 196; *Harris* v. *Board of Supervisors*, 105 Illinois, 445; *Lavalle* v. *Strobel*, 89 Illinois, 370.

VIII. The Act of the General Assembly of the State of Illinois, of April 15, 1873, purporting to repeal "The Lake Front act" of April 16, 1869, was absolutely void, and did not and could not operate to divest the title and rights of the Illinois Central Railroad Company, granted to it by the earlier act, the provisions of which it had formally accepted and acted upon. *Fletcher* v. *Peck*, 6 Cranch, 87; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Von Hoffman* v. *Quincy*, 4 Wall. 535.

MR. JUSTICE FIELD delivered the opinion of the court.

This suit was commenced on the 1st of March, 1883, in a Circuit Court of Illinois, by an information or bill in equity, filed by the Attorney General of the State, in the name of its people against the Illinois Central Railroad Company, a corporation created under its laws, and against the city of Chicago. The United States were also named as a party defendant, but they never appeared in the suit, and it was impossible to bring them in as a party without their consent. The alleged grievances arose solely from the acts and claims of the railroad company, but the city of Chicago was made a defendant because of its interest in the subject of the litigation. The railroad company filed its answer in the state court at the first term after the commencement of the suit, and upon its petition the case was removed to the Circuit Court of the United States for the Northern District of Illinois. In May following the city appeared to the suit and filed its answer, admitting all the allegations of fact in the bill. A subsequent motion by the complainant to remand the case to the state court was denied. 16 Fed. Rep. 881. The pleadings were afterwards altered in various particulars. An amended information or bill was filed by the Attorney General, and the city filed a cross-bill for affirmative relief against the State and the company. The latter appeared to the cross-bill and answered it, as did the Attorney General for the State. Each party has prosecuted a separate appeal.

The object of the suit is to obtain a judicial determination of the title of certain lands on the east or lake front of the city of Chicago, situated between the Chicago River and Sixteenth street, which have been reclaimed from the waters of the lake, and are occupied by the tracks, depots, warehouses, piers and other structures used by the railroad company in its business; and also of the title claimed by the company to the submerged lands, constituting the bed of the lake, lying east of its tracks, within the corporate limits of the city, for the distance of a mile, and between the south line of the south pier near Chicago River extended eastwardly, and a line

extended, in the same direction, from the south line of lot 21 near the company's round-house and machine shops. The determination of the title of the company will involve a consideration of its right to construct, for its own business, as well as for public convenience, wharves, piers and docks in the harbor.

We agree with the court below that, to a clear understanding of the numerous questions presented in this case, it was necessary to trace the history of the title to the several parcels of land claimed by the company. And the court, in its elaborate opinion, (33 Fed. Rep. 730,) for that purpose referred to the legislation of the United States and of the State, and to ordinances of the city and proceedings thereunder, and stated, with great minuteness of detail, every material provision of law and every step taken. We have with great care gone over the history detailed and are satisfied with its entire accuracy. It would, therefore, serve no useful purpose to repeat what is, in our opinion, clearly and fully narrated. In what we may say of the rights of the railroad company, of the State, and of the city, remaining after the legislation and proceedings taken, we shall assume the correctness of that history.

The State of Illinois was admitted into the Union in 1818 on an equal footing with the original States in all respects. Such was one of the conditions of the cession from Virginia of the territory northwest of the Ohio River, out of which the State was formed. But the equality prescribed would have existed if it had not been thus stipulated. There can be no distinction between the several States of the Union in the character of the jurisdiction, sovereignty and dominion which they may possess and exercise over persons and subjects within their respective limits. The boundaries of the State were prescribed by Congress and accepted by the State in its original Constitution. They are given in the bill. It is sufficient for our purpose to observe that they include within their eastern line all that portion of Lake Michigan lying east of the main land of the State and the middle of the lake south of latitude forty-two degrees and thirty minutes.

It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States. This doctrine has been often announced by this court, and is not questioned by counsel of any of the parties. *Pollard's Lessee* v. *Hagan,* 3 How. 212; *Weber* v. *Harbor Commissioners,* 18 Wall. 57.

The same doctrine is in this country held to be applicable to lands covered by fresh water in the Great Lakes over which is conducted an extended commerce with different States and foreign nations. These lakes possess all the general characteristics of open seas, except in the freshness of their waters, and in the absence of the ebb and flow of the tide. In other respects they are inland seas, and there is no reason or principle for the assertion of dominion and sovereignty over and ownership by the State of lands covered by tide waters that is not equally applicable to its ownership of and dominion and sovereignty over lands covered by the fresh waters of these lakes. At one time the existence of tide waters was deemed essential in determining the admiralty jurisdiction of courts in England. That doctrine is now repudiated in this country as wholly inapplicable to our condition. In England the ebb and flow of the tide constitute the legal test of the navigability of waters. There no waters are navigable in fact, at least to any great extent, which are not subject to the tide. There, as said in the case of *The Genesee Chief,* 12 How. 443, 455, "tide water and navigable water are synonymous terms, and tide water, with a few small and unimportant exceptions, meant nothing more than public rivers, as contradistinguished from private ones;" and writers on the subject of admiralty jurisdiction "took the ebb and flow of the tide as the test because it was a convenient one, and more easily determined

the character of the river.   Hence the established doctrine in England, that the admiralty jurisdiction is confined to the ebb and flow of the tide.   In other words, it is confined to public navigable waters."

But in this country the case is different.   Some of our rivers are navigable for great distances above the flow of the tide ; indeed, for hundreds of miles, by the largest vessels used in commerce.   As said in the case cited : " There is certainly nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit.   If it is a public navigable water, on which commerce is carried on between different States or nations, the reason for the jurisdiction is precisely the same.   And if a distinction is made on that account, it is merely arbitrary, without any foundation in reason ; and, indeed, would seem to be inconsistent with it."

The Great Lakes are not in any appreciable respect affected by the tide, and yet on their waters, as said above, a large commerce is carried on, exceeding in many instances the entire commerce of States on the borders of the sea.   When the reason of the limitation of admiralty jurisdiction in England was found inapplicable to the condition of navigable waters in this country, the limitation and all its incidents were discarded.   So also, by the common law, the doctrine of the dominion over and ownership by the crown of lands within the realm under tide waters is not founded upon the existence of the tide over the lands, but upon the fact that the waters are navigable, tide waters and navigable waters, as already said, being used as synonymous terms in England.   The public being interested in the use of such waters, the possession by private individuals of lands under them could not be permitted except by license of the crown, which could alone exercise such dominion over the waters as would insure freedom in their use so far as consistent with the public interest. The doctrine is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment, a reason as applicable to navigable fresh waters as to waters moved by the tide.   We hold, there-

fore, that the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies, which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and that the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations. Upon that theory we shall examine how far such dominion, sovereignty and proprietary right have been encroached upon by the railroad company, and how far that company had, at the time, the assent of the State to such encroachment, and also the validity of the claim which the company asserts of a right to make further encroachments thereon by virtue of a grant from the State in April, 1869.

The city of Chicago is situated upon the southwestern shore of Lake Michigan, and includes, with other territory, fractional sections 10 and 15, in township 39 north, range 14 east of the third principal meridian, bordering on the lake, which forms their eastern boundary. For a long time after the organization of the city its harbor was the Chicago River, a small, narrow stream opening into the lake near the centre of the east and west line of section 10, and in it the shipping arriving from other ports of the lake and navigable waters was moored or anchored, and along it were docks and wharves. The growth of the city in subsequent years in population, business and commerce required a larger and more convenient harbor, and the United States, in view of such expansion and growth, commenced the construction of a system of breakwaters and other harbor protections in the waters of the lake in front of the fractional sections mentioned. In the prosecution of this work there was constructed a line of breakwaters or cribs of wood and stone covering the front of the city between the Chicago River and Twelfth street, with openings in the piers or lines of cribs for the entrance and departure of vessels, thus enclosing a large part of the lake for the uses of shipping and commerce; and creating an outer harbor for Chicago. It comprises a space about one mile and one-half in length from north to south, and

is of a width from east to west varying from one thousand to four thousand feet. As commerce and shipping expand, the harbor will be further extended towards the south, and, as alleged by the amended bill, it is expected that the necessities of commerce will soon require its enlargement so as to include a great part of the entire lake front of the city. It is stated, and not denied, that the authorities of the United States have in a general way indicated a plan for the improvement and use of the harbor which has been enclosed as mentioned, by which a portion is devoted as a harbor of refuge where ships may ride at anchor with security and within protecting walls, and another portion of such enclosure nearer the shore of the lake may be devoted to wharves and piers, alongside of which ships may load and unload and upon which warehouses may be constructed and other structures erected for the convenience of lake commerce.

The case proceeds upon the theory and allegation that the defendant, the Illinois Central Railroad Company, has, without lawful authority, encroached, and continues to encroach, upon the domain of the State, and its original ownership and control of the waters of the harbor and of the lands thereunder, upon a claim of rights acquired under a grant from the State and ordinance of the city to enter the city and appropriate land and water two hundred feet wide in order to construct a track for a railway, and to erect thereon warehouses, piers and other structures in front of the city, and upon a claim of riparian rights acquired by virtue of ownership of lands originally bordering on the lake in front of the city. It also proceeds against the claim asserted by the railroad company of a grant by the State, in 1869, of its right and title to the submerged lands, constituting the bed of Lake Michigan lying east of the tracks and breakwater of the company, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended in the same direction from the south line of lot twenty-one south of and near the machine shops and round-house of the company; and of a right thereby to construct at its pleasure, in the harbor, wharves, piers and other works for its use.

The State prays a decree establishing and confirming its title to the bed of Lake Michigan and exclusive right to develop and improve the harbor of Chicago by the construction of docks, wharves, piers and other improvements, against the claim of the railroad company, that it has an absolute title to such submerged lands by the act of 1869, and the right, subject only to the paramount authority of the United States in the regulation of commerce, to fill all the bed of the lake within the limits above stated, for the purpose of its business; and the right, by the construction and maintenance of wharves, docks and piers, to improve the shore of the lake for the promotion generally of commerce and navigation. And the State, insisting that the company has, without right, erected and proposes to continue to erect wharves and piers upon its domain, asks that such alleged unlawful structures may be ordered to be removed, and the company be enjoined from erecting further structures of any kind.

And first, as to lands in the harbor of Chicago possessed and used by the railroad company under the act of Congress of September 20, 1850, (9 Stat. 466, c. 61,) and the ordinance of the city of June 14, 1852. By that act Congress granted to the State of Illinois a right of way, not exceeding one hundred feet in width, on each side of its length, through the public lands, for the construction of a railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi Rivers, with a branch to Chicago and another *via* the town of Galena to a point opposite Dubuque in the State of Iowa, with the right to take the necessary materials for its construction. And, to aid in the construction of the railroad and branches, by the same act it granted to the State six alternate sections of land, designated by even numbers, on each side of the road and branches, with the usual reservation of any portion found to be sold by the United States, or to which the right of pre-emption had attached at the time the route of the road and branches was definitely fixed, in which case provision was made for the selection of equivalent lands in contiguous sections.

The lands granted were made subject to the disposition of the legislature of the State; and it was declared that the railroad and its branches should be and remain a public highway for the use of the government of the United States, free from toll or other charge upon the transportation of their property or troops.

The act was formally accepted by the legislature of the State, February 17, 1851, (Laws of 1851, 192, 193.) A few days before, and on the 10th of that month, the Illinois Central Railroad Company was incorporated. It was invested generally with the powers, privileges, immunities and franchises of corporations, and specifically with the power of acquiring by purchase or otherwise, and of holding and conveying real and personal estate which might be needful to carry into effect fully the purposes of the act.

It was also authorized to survey, locate, construct and operate a railroad, with one or more tracks or lines of rails, between the points designated and the branches mentioned. And it was declared that the company should have a right of way upon, and might appropriate to its sole use and control, for the purposes contemplated, land not exceeding two hundred feet in width throughout its entire length; and might enter upon and take possession of and use any lands, streams and materials of every kind, for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, engine-houses, shops and other buildings necessary for completing, maintaining and operating the road. All such lands, waters, materials and privileges belonging to the State were granted to the corporation for that purpose; and it was provided that, when owned by or belonging to any person, company or corporation, and they could not be obtained by voluntary grant or release, the same might be taken and paid for by proceedings for condemnation as prescribed by law.

It was also enacted that nothing in the act should authorize the corporation to make a location of its road within any city without the consent of its common council. This consent was given by an ordinance of the common council of Chicago,

adopted June 14, 1852. By its first section it granted per-mission to the company to lay down, construct and maintain within the limits of the city, and along the margin of the lake within and adjacent to the same, a railroad, with one or more tracks, and to operate the same with locomotive engines and cars, under such rules and regulations with reference to speed of trains, the receipt, safe-keeping and delivery of freight, and arrangements for the accommodation and conveyance of pas-sengers, not inconsistent with the public safety, as the com-pany might from time to time establish, and to have the right of way and all powers incident to and necessary therefor in the manner and upon the ·following terms and conditions, namely, that the road should enter the city at or near the intersection of its then southern boundary with Lake Michi-gan, and follow the shore on or near the margin of the lake northerly to the southern bounds of the open space known as Lake Park, in front of canal section fifteen, and continue northerly across the open space in front of that section to such grounds as the company might acquire between the north line of Randolph street and the Chicago River, in the Fort Dearborn addition, upon which grounds should be located the depot of the railroad company within the city, and such other buildings, slips or apparatus as might be necessary and con-venient for its business. But it was understood that the city did not undertake to obtain for the company any right of way, or other right, privilege or easement, not then in its power to grant, or to assume any liability or responsibility for the acts of the company. It also declared that the company might enter upon and use in perpetuity for its line of road and other works necessary to protect the same from the lake, a width of three hundred feet from the southern boundary of the public ground near Twelfth street, to the northern line of Randolph street; the inner or west line of the ground to be not less than four hundred feet east from the west line of Michigan Avenue, and parallel thereto; and it was authorized to extend its works and fill out into the lake to a point in the southern pier not less than four hundred feet west from the then east end of the same, thence parallel with Michigan

Avenue to the north side of Randolph street, extended; but it was stated that the common council did not grant any right or privilege beyond the limits above specified, nor beyond the line that might be actually occupied by the works of the company.

By the ordinance the company was required to erect and maintain on the western or inner line of the ground pointed out for its main tracks on the lake shore such suitable walls, fences or other sufficient works as would prevent animals from straying upon or obstructing its tracks, and secure persons and property from danger; and to construct such suitable gates at proper places at the ends of the streets, which were then or might thereafter be laid out, as required by the common council, to afford safe access to the lake; and provided that, in the case of the construction of an outside harbor, streets might be laid out to approach the same in the manner provided by law. The company was also required to erect and complete within three years after it should have accepted the ordinance, and forever thereafter maintain, a continuous wall or structure of stone masonry, pier-work or other sufficient material, of regular and sightly appearance, and not to exceed in height the general level of Michigan Avenue, opposite thereto, from the north side of Randolph street to the southern bound of Lake Park, at a distance of not more than three hundred feet east from and parallel with the western or inner line of the company, and continue the works to the southern boundary of the city, at such distance outside of the track of the road as might be expedient; which structure and works should be of sufficient strength and magnitude to protect the entire front of the city, between the north line of Randolph street and its southern boundary, from further damage or injury from the action of the waters of Lake Michigan; and that that part of the structure south of Lake Park should be commenced and prosecuted with reasonable despatch after acceptance of the ordinance. It was also enacted that the company should "not in any manner, nor for any purpose whatever, occupy, use or intrude upon the open ground known as 'Lake Park,' belonging to the city of Chicago, lying between Michigan Avenue and the western or inner line before mentioned, except so far

as the common council may consent, for the convenience of said company, while constructing or repairing the works in front of said ground." And it was declared that the company should "erect no buildings between the north line of Randolph street and the south side of the said Lake Park, nor occupy nor use the works proposed to be constructed between these points, except for the passage of or for making up or distributing their trains, nor place upon any part of their works between said points any obstruction to the view of the lake from the shore, nor suffer their locomotives, cars or other articles to remain upon their tracks, but only erect such works as are proper for the construction of their necessary tracks and protection of the same."

The company was allowed ninety days to accept this ordinance, and it was provided that upon such acceptance a contract embodying its provisions should be executed and delivered between the city and the company, and that the rights and privileges conferred upon the company should depend upon the performance on its part of the requirements made. The ordinance was accepted and the required agreement drawn and executed on the 28th of March, 1853.

Under the authority of this ordinance the railroad company located its tracks within the corporate limits of the city. Those running northward from Twelfth street were laid upon piling in the waters of the lake. The shore line of the lake was, at that time, at Park Row, about four hundred feet from the west line of Michigan Avenue, and at Randolph street about one hundred and twelve and a half feet. Since then the space between the shore line and the tracks of the railroad company has been filled with earth under the direction of the city and is now solid ground.

After the tracks were constructed the company erected a breakwater east of its roadway upon a line parallel with the west line of Michigan Avenue, and afterwards filled up the space between the breakwater and its tracks with earth and stone.

We do not deem it material, for the determination of any questions presented in this case, to describe in detail the extensive works of the railroad company under the permission given

to locate its road within the city by the ordinance. It is sufficient to say that when this suit was commenced it had reclaimed from the waters of the lake a tract, two hundred feet in width, for the whole distance allowed for its entry within the city, and constructed thereon the tracks needed for its railway, with all the guards against danger in its approach and crossings as specified in the ordinance, and erected the designated breakwater beyond its tracks on the east, and the necessary works for the protection of the shore on the west. Its works in no respect interfered with any useful freedom in the use of the waters of the lake for commerce, foreign, interstate or domestic. They were constructed under the authority of the law by the requirement of the city as a condition of its consent that the company might locate its road within its limits, and cannot be regarded as such an encroachment upon the domain of the State as to require the interposition of the court for their removal or for any restraint in their use.

The railroad company never acquired by the reclamation from the waters of the lake of the land upon which its tracks are laid, or by the construction of the road and works connected therewith, an absolute fee in the tract reclaimed, with a consequent right to dispose of the same to other parties, or to use it for any other purpose than the one designated — the construction and operation of a railroad thereon with one or more tracks and works in connection with the road or in aid thereof. The act incorporating the company only granted to it a right of way over the public lands for its use and control, for the purpose contemplated, which was to enable it to survey, locate, and construct and operate a railroad. All lands, waters, materials and privileges belonging to the State were granted solely for that purpose. It did not contemplate, much less authorize, any diversion of the property to any other purpose. The use of it was restricted to the purpose expressed. Whilst the grant to it included waters of streams in the line of the right of way belonging to the State, it was accompanied with a declaration that it should not be so construed as to authorize the corporation to interrupt the navigation of the streams. If the waters of the lake may be deemed to be included in the

designation of streams, then their use would be held equally restricted. The prohibition upon the company to make a location of its road within any city, without the consent of its common council, necessarily empowered that body to prescribe the conditions of the entry so far at least as to designate the place where it should be made, the character of the tracks to be laid, and the protection and guards that should be constructed to insure their safety. Nor did the railroad company acquire by the mere construction of its road and other works any rights as a riparian owner to reclaim still further lands from the waters of the lake for its use, or the construction of piers, docks and wharves in the furtherance of its business. The extent to which it could reclaim the land under the waters was limited by the conditions of the ordinance, which was simply for the construction of a railroad on a tract not to exceed a specified width, and of works connected therewith.

We shall hereafter consider what rights the company acquired as a riparian owner from its acquisition of title to lands on the shore of the lake, but at present we are speaking only of what rights it acquired from the reclamation of the tract upon which the railroad and the works in connection with it are built. The construction of a pier or the extension of any land into navigable waters for a railroad or other purposes, by one not the owner of lands on the shore, does not give the builder of such pier or extension, whether an individual or corporation, any riparian rights. Those rights are incident to riparian ownership. They exist with such ownership and pass with the transfer of the land. And the land must not only be contiguous to the water, but in contact with it. Proximity without contact is insufficient. The riparian right attaches to land on the border of navigable water without any declaration to that effect from the former owner, and its designation in a conveyance by him would be surplusage. (See Gould on Waters, § 148, and authorities there cited.)

The riparian proprietor is entitled, among other rights, as held in *Yates* v. *Milwaukee*, 10 Wall. 497, 504, to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf or pier for his

own use or for the use of the public, subject to such general rules and regulations as the legislature may prescribe for the protection of the rights of the public. In the case cited the court held that this riparian right was property and valuable; and though it must be enjoyed in due subjection to the rights of the public, it could not be arbitrarily or capriciously impaired. It had been held in the previous case of *Dutton* v. *Strong*, 1 Black, 23, 33, that whenever the water of the shore was too shoal to be navigable, there was the same necessity for wharves, piers and landing places as in the bays and arms of the sea; that where that necessity existed, it was difficult to see any reason for denying to the adjacent owner the right to supply it; but that the right must be understood as terminating at the point of navigability, where the necessity for such erections ordinarily ceased.

In this case it appears that fractional section 10, which was included within the city limits bordering on the lake front, was, many years before this suit was brought, divided, under the authority of the United States, into blocks and lots, and the lots sold. The proceedings taken and the laws passed on the subject for the sale of the lots are stated with great particularity in the opinion of the court below, but for our purpose it is sufficient to mention that the lots laid out in fractional section 10 belonging to the United States were sold, and, either directly or from purchasers, the title to some of them fronting on the lake north of Randolph street became vested in the railroad company, and the company, finding the lake in front of those lots shallow, filled it in and upon the reclaimed land constructed slips, wharves and piers, the last three piers in 1872, 1873, 1880, and 1881, which it claims to own and to have the right to use in its business.

According to the law of riparian ownership, which we have stated, this claim is well founded so far as the piers do not extend beyond the point of navigability in the waters of the lake. We are not fully satisfied that such is the case from the evidence which the company has produced, and the fact is not conceded. Nor does the court below find that such navigable point had been established by any public authority

or judicial decision, or that it had any foundation other than the judgment of the railroad company.

The same position may be taken as to the claim of the company to the pier and docks erected in front of Michigan Avenue between the lines of Twelfth and Sixteenth streets extended. The company had previously acquired the title to certain lots fronting on the lake at that point, and, upon its claim of riparian rights from that ownership, had erected the structures in question. Its ownership of them likewise depends upon the question whether they are extended beyond or are limited to the navigable point of the waters of the lake, of which no satisfactory evidence was offered.

Upon the land reclaimed by the railroad company as riparian proprietor in front of lots into which section ten was divided, which it had purchased, its passenger depot was erected north of Randolph street, and, to facilitate its approach, the common council, by ordinance adopted September 10, 1855, authorized it to curve its tracks westwardly of the line fixed by the ordinance of 1852, so as to cross that line at a point not more than two hundred feet south of Randolph street, in accordance with a specified plan. This permission was given upon the condition that the company should lay out upon its own land west of and alongside its passenger house a street fifty feet wide, extending from Water street to Randolph street, and fill the same up its entire length, within two years from the passage of the ordinance. The company's tracks were curved as permitted, the street referred to was opened; the required filling was done, and the street has ever since been used by the public. It being necessary that the railroad company should have additional means of approaching and using its station grounds between Randolph street, and the Chicago River, the city, by another ordinance adopted September 15, 1856, granted it permission to enter and use, in perpetuity, for its line of railroad and other works necessary to protect the same from the lake, the space between its then breakwater and a line drawn from a point thereon seven hundred feet south of the north line of Randolph street extended, and running thence on a straight line to the southeast corner of

its present breakwater, thence to the river; and the space thus indicated the railroad company occupied and continued to hold pursuant to this ordinance, and we do not perceive any valid objection to its continued holding of the same for the purposes declared — that is, as additional means of approaching and using its station grounds.

We proceed to consider the claim of the railroad company to the ownership of submerged lands in the harbor, and the right to construct such wharves, piers, docks and other works therein as it may deem proper for its interest and business. The claim is founded upon the third section of the act of the legislature of the State passed on the 16th of April, 1869, the material part of which is as follows:

"SEC. 3. The right of the Illinois Central Railroad Company under the grant from the State in its charter, which said grant constitutes a part of the consideration for which the said company pays to the State at least seven per cent of its gross earnings, and under and by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident to such grant, appropriation, occupancy, use and control, in and to the lands submerged or otherwise lying east of the said line running parallel with and four hundred feet east of the west line of Michigan Avenue, in fractional sections ten and fifteen, township and range as aforesaid, is hereby confirmed; and all the right and title of the State of Illinois in and to the submerged lands constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company, for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot twenty-one, south of and near to the round-house and machine shops of said company, in the south division of the said city of Chicago, are hereby granted in fee to the said Illinois Central Railroad Company, its successors and assigns: provided, however, that the fee to said lands shall be held by said company in perpetuity, and that the said company shall not have power to grant, sell or convey the fee to the same; and that all gross receipts from use, profits, leases or otherwise of said lands, or the improvements

thereon, or that may hereafter be made thereon, shall form a part of the gross proceeds, receipts and income of the said Illinois Central Railroad Company, upon which said company shall forever pay into the State treasury, semi-annually, the per centum provided for in its charter, in accordance with the requirements of said charter: and provided also, that nothing herein contained shall authorize obstructions to the Chicago harbor, or impair the public right of navigation; nor shall this act be construed to exempt the Illinois Central Railroad Company, its lessees or assigns, from any act of the general assembly which may be hereafter passed regulating the rates of wharfage and dockage to be charged in said harbor."

The act, of which this section is a part, was accepted by a resolution of the board of directors of the company at its office in the city of New York, July 6, 1870; but the acceptance was not communicated to the State until the 18th of November, 1870. A copy of the resolution was on that day forwarded to the Secretary of State, and filed and recorded by him in the records of his office. On the 15th of April, 1873, the legislature of Illinois repealed the act. The questions presented relate to the validity of the section cited of the act and the effect of the repeal upon its operation.

The section in question has two objects in view: one was to confirm certain alleged rights of the railroad company under the grant from the State in its charter and under and "by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident" thereto, in and to the lands submerged or otherwise lying east of a line parallel with and four hundred feet east of the west line of Michigan Avenue, in fractional sections ten and fifteen. The other object was to grant to the railroad company submerged lands in the harbor.

The confirmation made, whatever the operation claimed for it in other respects, cannot be invoked so as to extend the riparian right which the company possessed, from its ownership of lands in sections ten and fifteen on the shore of the lake. Whether the piers or docks constructed by it, after the passage of the act of 1869, extend beyond the point of navigability in the waters of the lake, must be the subject of judicial

inquiry upon the execution of this decree in the court below. If it be ascertained upon such inquiry and determined that such piers and docks do not extend beyond the point of practicable navigability, the claim of the railroad company to their title and possession will be confirmed; but if they or either of them are found on such inquiry to extend beyond the point of such navigability, then the State will be entitled to a decree that they, or the one thus extended, be abated and removed to the extent shown, or for such other disposition of the extension as, upon the application of the State and the facts established, may be authorized by law.

As to the grant of the submerged lands, the act declares that all the right and title of the State in and to the submerged lands, constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the company for the distance of one mile, and between the south line of the south pier extended eastwardly and a line extended eastwardly from the south line of lot twenty-one, south of and near to the round-house and machine shops of the company "are granted in fee to the railroad company, its successors and assigns." The grant is accompanied with a proviso that the fee of the lands shall be held by the company in perpetuity, and that it shall not have the power to grant, sell or convey the fee thereof. It also declares that nothing therein shall authorize obstructions to the harbor or impair the public right of navigation, or be construed to exempt the company from any act regulating the rates of wharfage and dockage to be charged in the harbor.

This clause is treated by the counsel of the company as an absolute conveyance to it of title to the submerged lands, giving it as full and complete power to use and dispose of the same, except in the technical transfer of the fee, in any manner it may choose, as if they were uplands, in no respect covered or affected by navigable waters, and not as a license to use the lands subject to revocation by the State. Treating it as such a conveyance, its validity must be determined by the consideration whether the legislature was competent to make a grant of the kind.

The act, if valid and operative to the extent claimed, placed

under the control of the railroad company nearly the whole of the submerged lands of the harbor, subject only to the limitations that it should not authorize obstructions to the harbor or impair the public right of navigation, or exclude the legislature from regulating the rates of wharfage or dockage to be charged. With these limitations the act put it in the power of the company to delay indefinitely the improvement of the harbor, or to construct as many docks, piers and wharves and other works as it might choose, and at such positions in the harbor as might suit its purposes, and permit any kind of business to be conducted thereon, and to lease them out on its own terms, for indefinite periods. The inhibition against the technical transfer of the fee of any portion of the submerged lands was of little consequence when it could make a lease for any period and renew it at its pleasure. And the inhibitions against authorizing obstructions to the harbor and impairing the public right of navigation placed no impediments upon the action of the railroad company which did not previously exist. A corporation created for one purpose, the construction and operation of a railroad between designated points, is, by the act, converted into a corporation to manage and practically control the harbor of Chicago, not simply for its own purpose as a railroad corporation, but for its own profit generally.

The circumstances attending the passage of the act through the legislature were on the hearing the subject of much criticism. As originally introduced, the purpose of the act was to enable the city of Chicago to enlarge its harbor and to grant to it the title and interest of the State to certain lands adjacent to the shore of Lake Michigan on the eastern front of the city, and place the harbor under its control, giving it all the necessary powers for its wise management. But during the passage of the act its purport was changed. Instead of providing for the cession of the submerged lands to the city, it provided for a cession of them to the railroad company. It was urged that the title of the act was not changed to correspond with its changed purpose, and an objection was taken to its validity on that account. But the majority of the court were of opinion that the evidence was insufficient to show that

the requirement of the constitution of the State, in its passage, was not complied with.

The question, therefore, to be considered is whether the legislature was competent to thus deprive the State of its ownership of the submerged lands in the harbor of Chicago, and of the consequent control of its waters; or, in other words, whether the railroad corporation can hold the lands and control the waters by the grant, against any future exercise of power over them by the State.

That the State holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the State holds title to soils under tide water, by the common law, we have already shown, and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use. But it is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the

navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. General language sometimes found in opinions of the courts, expressive of absolute ownership and control by the State of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular cases. A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to

revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State.

The harbor of Chicago is of immense value to the people of the State of Illinois in the facilities it affords to its vast and constantly increasing commerce; and the idea that its legislature can deprive the State of control over its bed and waters and place the same in the hands of a private corporation created for a different purpose, one limited to transportation of passengers and freight between distant points and the city, is a proposition that cannot be defended.

The area of the submerged lands proposed to be ceded by the act in question to the railroad company embraces something more than a thousand acres, being, as stated by counsel, more than three times the area of the outer harbor, and not only including all of that harbor but embracing adjoining submerged lands which will, in all probability, be hereafter included in the harbor. It is as large as that embraced by all the merchandise docks along the Thames at London; is much larger than that included in the famous docks and basins at Liverpool; is twice that of the port of Marseilles, and nearly if not quite equal to the pier area along the water front of the city of New York. And the arrivals and clearings of vessels at the port exceed in number those of New York, and are equal to those of New York and Boston combined. Chicago has nearly twenty-five per cent of the lake carrying trade as compared with the arrivals and clearings of all the leading ports of our great inland seas. In the year ending June 30, 1886, the joint arrivals and clearances of vessels at that port amounted to twenty-two thousand and ninety-six, with a tonnage of over seven millions; and in 1890 the tonnage of the vessels reached nearly nine millions. As stated by counsel, since the passage of the Lake Front Act, in 1869, the population of the city has increased nearly a million souls, and the increase of commerce has kept pace with it. It is hardly conceivable that the legislature can divest the State of the control

and management of this harbor and vest it absolutely in a private corporation. Surely an act of the legislature transferring the title to its submerged lands and the power claimed by the railroad company, to a foreign State or nation would be repudiated, without hesitation, as a gross perversion of the trust over the property under which it is held. So would a similar transfer to a corporation of another State. It would not be listened to that the control and management of the harbor of that great city — a subject of concern to the whole people of the State — should thus be placed elsewhere than in the State itself. All the objections which can be urged to such attempted transfer may be urged to a transfer to a private corporation like the railroad company in this case.

Any grant of the kind is necessarily revocable, and the exercise of the trust by which the property was held by the State can be resumed at any time. Undoubtedly there may be expenses incurred in improvements made under such a grant which the State ought to pay; but, be that as it may, the power to resume the trust whenever the State judges best is, we think, incontrovertible. The position advanced by the railroad company in support of its claim to the ownership of the submerged lands and the right to the erection of wharves, piers and docks at its pleasure, or for its business in the harbor of Chicago, would place every harbor in the country at the mercy of a majority of the legislature of the State in which the harbor is situated.

We cannot, it is true, cite any authority where a grant of this kind has been held invalid, for we believe that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation. But the decisions are numerous which declare that such property is held by the State, by virtue of its sovereignty, in trust for the public. The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, is governmental and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels

can be disposed of without detriment to the public interest in the lands and waters remaining.

This follows necessarily from the public character of the property, being held by the whole people for purposes in which the whole people are interested. As said by Chief Justice Taney, in *Martin* v. *Waddell*, 16 Pet. 367, 410: "When the Revolution took place the people of each State became themselves sovereign, and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the Constitution to the general government." In *Arnold* v. *Mundy*, 1 Halsted, 1, which is cited by this court in *Martin* v. *Waddell*, 16 Pet. 418, and spoken of by Chief Justice Taney as entitled to great weight, and in which the decision was made "with great deliberation and research," the Supreme Court of New Jersey comments upon the rights of the State in the bed of navigable waters, and, after observing that the power exercised by the State over the lands and waters is nothing more than what is called the *jus regium*, the right of regulating, improving and securing them for the benefit of every individual citizen, adds: "The sovereign power, itself, therefore, cannot consistently with the principles of the law of nature and the constitution of a well-ordered society, make a direct and absolute grant of the waters of the State, divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people." Necessarily must the control of the waters of a State over all lands under them pass when the lands are conveyed in fee to private parties, and are by them subjected to use.

In the case of *Stockton* v. *Baltimore and New York Railroad Company*, 32 Fed. Rep. 9, 19, 20, which involved a consideration by Mr. Justice Bradley, late of this court, of the nature of the ownership by the State of lands under the navigable waters of the United States, he said:

"It is insisted that the property of the State in lands under its navigable waters is private property, and comes strictly within the constitutional provision. It is significantly asked,

can the United States take the state house at Trenton, and the surrounding grounds belonging to the State, and appropriate them to the purposes of a railroad depot, or to any other use of the general government, without compensation? We do not apprehend that the decision of the present case involves or requires a serious answer to this question. The cases are clearly not parallel. The character of the title or ownership by which the State holds the state house is quite different from that by which it holds the land under the navigable waters in and around its territory. The information rightly states that, prior to the Revolution, the shore and lands under water of the navigable streams and waters of the province of New Jersey belonged to the King of Great Britain as part of the *jura regalia* of the crown, and devolved to the State by right of conquest. The information does not state, however, what is equally true, that, after the conquest, the said lands were held by the State, as they were by the king, *in trust* for the public uses of navigation and fishery, *and the erection* thereon of wharves, piers, light-houses, beacons and other facilities of navigation and commerce. Being subject to this trust, they were *publici juris;* in other words, they were held for the use of the people at large. It is true that to utilize the fisheries, especially those of shell fish, it was necessary to parcel them out to particular operators, and employ the rent or consideration for the benefit of the whole people; but this did not alter the character of the title. The land remained subject to all other public uses as before, especially to those of navigation and commerce, which are always paramount to those of public fisheries. It is also true that portions of the submerged shoals and flats, which really interfered with navigation, and could better subserve the purposes of commerce by being filled up and reclaimed, were disposed of to individuals for that purpose. But neither did these dispositions of useless parts affect the character of the title to the remainder."

Many other cases might be cited where it has been decided that the bed or soil of navigable waters is held by the people of the State in their character as sovereign in trust for public.

uses for which they are adapted.   *Martin* v. *Waddell*, 16 Pet. 367, 410; *Pollard's Lessee* v. *Hagan*, 3 How. 212, 220; *Mc-Cready* v. *Virginia*, 94 U. S. 391, 394.

In *People* v. *New York and Staten Island Ferry Co.*, 68 N. Y. 71, 76, the Court of Appeals of New York said :

"The title to lands under tide waters, within the realm of England, were, by the common law, deemed to be vested in the king as a public trust, to subserve and protect the public right to use them as common highways for commerce, trade, and intercourse.   The king, by virtue of his proprietary interest could grant the soil so that it should become private property, but his grant was subject to the paramount right of public use of navigable waters, which he could neither destroy nor abridge.   In every such grant there was an implied reservation of the public right, and so far as it assumed to interfere with it, or to confer a right to impede or obstruct navigation, or to make an exclusive appropriation of the use of navigable waters, the grant was void.   In his treatise De Jure Maris (p. 22) Lord Hale says: 'The *jus privatum* that is acquired by the subject, either by patent or prescription, must not prejudice the *jus publicum*, wherewith public rivers and the arms of the sea are affected to public use;' and Mr. Justice Best, in *Blundell* v. *Catterall*, 5 B. & A. 268, in speaking of the subject, says: 'The soil can only be transferred subject to the public trust, and general usage shows that the public right has been excepted out of the grant of the soil.'   . . .

"The principle of the common law to which we have adverted is founded upon the most obvious principles of public policy.   The sea and navigable rivers are natural highways, and any obstruction to the common right, or exclusive appropriation of their use, is injurious to commerce, and if permitted at the will of the sovereign, would be very likely to end in materially crippling, if not destroying it.   The laws of most nations have sedulously guarded the public use of navigable waters within their limits against infringement, subjecting it only to such regulation by the State, in the interest of the public, as is deemed consistent with the preservation of the public right."

While the opinion of the New York court contains some expressions which may require explanation when detached from the particular facts of that case, the general observations we cite are just and pertinent.

The soil under navigable waters being held by the people of the State in trust for the common use and as a portion of their inherent sovereignty, any act of legislation concerning their use affects the public welfare. It is, therefore, appropriately within the exercise of the police power of the State.

In *Newton* v. *Commissioners*, 100 U. S. 548, it appeared that by an act passed by the legislature of Ohio, in 1846, it was provided that upon the fulfilment of certain conditions by the proprietors or citizens of the town of Canfield, the county seat should be permanently established in that town. Those conditions having been complied with, the county seat was established therein accordingly. In 1874 the legislature passed an act for the removal of the county seat to another town. Certain citizens of Canfield thereupon filed their bill, setting forth the act of 1846, and claiming that the proceedings constituted an executed contract, and prayed for an injunction against the contemplated removal. But the court refused the injunction, holding that there could be no contract and no irrepealable law upon governmental subjects, observing that legislative acts concerning public interests are necessarily public laws; that every succeeding legislature possesses the same jurisdiction and power as its predecessor; that the latter have the same power of repeal and modification which the former had of enactment, neither more nor less; that all occupy in this respect a footing of perfect equality; that this is necessarily so in the nature of things; that it is vital to the public welfare that each one should be able, at all times, to do whatever the varying circumstances and present exigencies attending the subject may require; and that a different result would be fraught with evil.

As counsel observe, if this is true doctrine as to the location of a county seat it is apparent that it must apply with greater force to the control of the soils and beds of navigable waters in the great public harbors held by the people in trust for

their common use and of common right as an incident to their sovereignty. The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. The legislation which may be needed one day for the harbor may be different from the legislation that may be required at another day. Every legislature must, at the time of its existence, exercise the power of the State in the execution of the trust devolved upon it. We hold, therefore, that any attempted cession of the ownership and control of the State in and over the submerged lands in Lake Michigan, by the act of April 16, 1869, was inoperative to affect, modify or in any respect to control the sovereignty and dominion of the State over the lands, or its ownership thereof, and that any such attempted operation of the act was annulled by the repealing act of April 15, 1873, which to that extent was valid and effective. There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it.

The legislation of the State in the Lake Front Act, purporting to grant the fee of the submerged lands mentioned to the railroad company, was considered by the court below, in view of the preceding measures taken for the improvement of the harbor, and because further improvement in the same direction was contemplated, as a mere license to the company to prosecute such further improvement as an agency of the State, and that to this end the State had placed certain of its resources at the command of the company with such an enlargement of its powers and privileges as enabled it to accomplish the objects in view. And the court below, after observing that the act might be assumed as investing the railroad company with the power, not given in its original charter, of erecting and maintaining wharves, docks and piers in the interest of commerce, and beyond the necessities or legitimate purposes of its own business as a railroad corporation, added that it was unable to perceive why it was not competent for the State, by subsequent legislation, to repeal the act and withdraw the additional powers of the company, thereby restricting it to the

business for which it was incorporated, and to resume control of the resources and property which it had placed at the command of the company for the improvement of the harbor. The court, treating the act as a license to the company, also observed that it was deemed best, when that act was passed, for the public interest that the improvement of the harbor should be effected by the instrumentality of a railroad corporation interested, to some extent, in the accomplishment of that result, and said : "But if the State subsequently determined, upon consideration of public policy, that this great work should not be entrusted to any railroad corporation, and that a corporation should not be the owner of even a qualified fee in the soil under the navigable waters of the harbor, no provision of the national or State constitution forbade the general assembly of Illinois from giving effect, by legislation, to this change of policy. It cannot be claimed that the repeal of the act of 1869 took from the company a single right conferred upon it by its original charter. That act only granted additional powers and privileges for which the railroad company paid nothing, although, in consideration of the grant of such additional powers and privileges, it agreed to pay a certain per centum of the gross proceeds, receipts, and incomes which it *might* derive either from the lands granted by the act, or from any improvements erected thereon. But it was not absolutely bound, by anything contained in the act, to make use of the submerged lands for the purposes contemplated by the legislature — certainly not within any given time — and could not have been called upon to pay such per centum until after the lands were used and improved, and income derived therefrom. The repeal of the act relieved the corporation from any obligation to pay the per centum referred to, because it had the effect to take from it the property from which alone the contemplated income could be derived. So that the effect of the act of 1873 was only to remit the railroad company to the exercise of the powers, privileges and franchises granted in its original charter, and withdraw from it the additional powers given by the act of 1869 for the accomplishment of certain public objects." If the act in question

be treated as a mere license to the company to make the improvement in the harbor contemplated as an agency of the State, then we think the right to cancel the agency and revoke its power is unquestionable.

It remains to consider the claim of the city of Chicago to portions of the east water front and how such claim, and the rights attached to it, are interfered with by the railroad company.

The claim of the city is to the ownership in fee of the streets, alleys, ways, commons and other public grounds on the east front of the city bordering on the lake, as exhibited on the maps showing the subdivision of fractional sections ten and fifteen, prepared under the supervision and direction of United States officers in the one case and by the canal commissioners in the other, and duly recorded, and the riparian rights attached to such ownership. By a statute of Illinois the making, acknowledging and recording of the plats operated to vest the title to the streets, alleys, ways and commons, and other public grounds designated on such plats, in the city, in trust for the public uses to which they were applicable. *Canal Trustees* v. *Havens*, 11 Illinois, 556; *Chicago* v. *Rumsey*, 87 Illinois, 354.

Such property, besides other parcels, included the whole of that portion of fractional section fifteen which constitutes Michigan Avenue, and that part of the fractional section lying east of the west line of Michigan Avenue, and that portion of fractional section ten designated on one of the plats as "public ground," which was always to remain open and free from any buildings.

The estate, real and personal, held by the trustees of the town of Chicago was vested in the city of Chicago by the act of March 4, 1837. It followed that when the Lake Front Act of 1869 was passed the fee was in the city, subject to the public uses designated, of all the portions of section ten and fifteen, particularly described in the decree below. And we agree with the court below that the fee of the made or reclaimed ground between Randolph street and Park Row, embracing the ground upon which rest the tracks and the

breakwater of the railroad company south of Randolph street, was in the city. The fact that the land which the city had a right to fill in and appropriate by virtue of its ownership of the grounds in front of the lake had been filled in by the railroad company in the construction of the tracks for its railroad and for the breakwater on the shore west of it, did not deprive the city of its riparian rights. The exercise of those rights was only subject to the condition of the agreement with the city, under which the tracks and breakwater were constructed by the railroad company, and that was for a perpetual right of way over the ground for its tracks of railway, and, necessarily, the continuance of the breakwater as a protection of its works and the shore from the violence of the lake. With this reservation of the right of the railroad company to its use of the tracts on ground reclaimed by it and the continuance of the breakwater, the city possesses the same right of riparian ownership, and is at full liberty to exercise it, which it ever did.

We also agree with the court below that the city of Chicago, as riparian owner of the grounds on its east or lake front of the city, between the north line of Randolph street and the north line of block twenty-three, each of the lines being produced to Lake Michigan, and in virtue of authority conferred by its charter, has the power to construct and keep in repair on the lake front, east of said premises, within the lines mentioned, public landing places, wharves, docks and levees, subject, however, in the execution of that power, to the authority of the State to prescribe the lines beyond which piers, docks, wharves and other structures, other than those erected by the general government, may not be extended into the navigable waters of the harbor, and to such supervision and control as the United States may rightfully exercise.

It follows from the views expressed, and it is so declared and adjudged, that the State of Illinois is the owner in fee of the submerged lands constituting the bed of Lake Michigan, which the third section of the act of April 16, 1869, purported to grant to the Illinois Central Railroad Company, and that the act of April 15, 1873, repealing the same is valid and effective

for the purpose of restoring to the State the same control, dominion and ownership of said lands that it had prior to the passage of the act of April 16, 1869.

But the decree below, as it respects the pier commenced in 1872, and the piers completed in 1880 and 1881, marked 1, 2, and 3, near Chicago River, and the pier and docks between and in front of Twelfth and Sixteenth streets, is modified so as to direct the court below to order such investigation to be made as may enable it to determine whether those piers erected by the company, by virtue of its riparian proprietorship of lots formerly constituting part of section ten, extend into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake; and, if it be determined upon such investigation that said piers, or any of them, do not extend beyond such point, then that the title and possession of the railroad company to such piers shall be affirmed by the court; but if it be ascertained and determined that such piers, or any of them, do extend beyond such navigable point, then the said court shall direct the said pier or piers, to the excess ascertained, to be abated and removed, or that other proceedings relating thereto be taken on the application of the State as may be authorized by law; and also to order that similar proceedings be taken to ascertain and determine whether or not the pier and dock, constructed by the railroad company in front of the shore between Twelfth and Sixteenth streets extend beyond the point of navigability, and to affirm the title and possession of the company if they do not extend beyond such point, and, if they do extend beyond such point, to order the abatement and removal of the excess, or that other proceedings relating thereto be taken on application of the State as may be authorized by law

*Except as modified in the particulars mentioned, the decree in each of the three cases on appeal must be affirmed, with costs against the railroad company; and it is so ordered.*

MR. JUSTICE SHIRAS, with whom concurred MR. JUSTICE GRAY and MR. JUSTICE BROWN, dissenting.

That the ownership of a State in the lands underlying its navigable waters is as complete, and its power to make them the subject of conveyance and grant is as full, as such ownership and power to grant in the case of the other public lands of the State, I have supposed to be well settled.

Thus it was said in *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65, that "upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits passed to the State, *with the consequent right to dispose of the title to any part of said soils* in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the general government."

In *Hoboken* v. *Pennsylvania Railroad*, 124 U. S. 656, 657, — a case in many respects like the present — it was said: "Lands below high-water mark on navigable waters are the absolute property of the State, subject only to the power conferred upon Congress to regulate foreign commerce and commerce between the States, and *they may be granted by the State*, either to the riparian proprietors or to a stranger, as the State may see fit," and, accordingly, it was *held*, "that the grant by the State of New Jersey to the United Companies by the act of March 31, 1869, was intended to secure, and does secure, to the respective grantees the whole beneficial interest in their respective properties, for their exclusive use for the purposes expressed in the grants."

In *Stevens* v. *Paterson & Newark Railroad*, 5 Vroom, (34 N. J. Law,) 532, it was declared by the Court of Errors and Appeals of New Jersey that it was competent for the State to grant to a stranger lands constituting the shore of a navigable river under tide water below the tide-water mark, to be occupied and used with structures and improvements.

*Langdon* v. *New York City*, 93 N. Y. 129, 155, was a case in which it was said by the Court of Appeals of New York: "From the earliest times in England the law has vested the

title to, and the control over, the navigable waters therein, in the crown and parliament. A distinction was taken between the mere ownership of the soil under water and the control over it for public purposes. The ownership of the soil, analogous to the ownership of dry land, was regarded as *jus privatum*, and was vested in the crown. But the right to use and control both the land and water was deemed a *jus publicum*, and was vested in parliament. The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament. . . . In this country, the State has succeeded to all the rights of both crown and parliament in the navigable waters and the soil under them, and here the *jus privatum* and the *jus publicum* are both vested in the State."

These citations might be indefinitely multiplied from authorities both Federal and State.

The State of Illinois, by her information or bill of complaint in this case, alleges that "the claims of the defendants are a great and irreparable injury to the State of Illinois as *a proprietor and owner of the bed of the lake*, throwing doubts and clouds upon its title thereto, and preventing an *advantageous sale or other disposition thereof;*" and in the prayer for relief the State asks that "its title may be established and confirmed, that the claims made by the railroad company may be declared to be unfounded, and that the State of Illinois may be declared to have the sole and exclusive right to develop the harbor of Chicago by the construction of docks, wharves, etc., and to *dispose of such rights at its pleasure.*"

Indeed, the logic of the State's case, as well as her pleadings, attributes to the State entire power to hold and dispose of, by grant or lease, the lands in question; and her case is put upon the alleged invalidity of the title of the railroad company, arising out of the asserted unconstitutionality of the act of 1869, which act made the grant, by reason of certain irregularities in its passage and title, or, that ground failing, upon the right of the State to arbitrarily revoke the grant, as a

mere license, and which right she claims to have duly exercised by the passage of the act of 1873.

The opinion of the majority, if I rightly apprehend it, likewise concedes that a State does possess the power to grant the rights of property and possession in such lands to private parties, but. the power is stated to be, in some way restricted to "small parcels, or where such parcels can. be disposed of without detriment to the public interests in the lands and waters remaining." But it is difficult to see how the validity of the exercise of the power, if the power exists, can depend upon the size of the parcel granted, or how, if it be 'possible to imagine that the power is subject to such a limitation, the present case would be affected, as the grant in question, though doubtless a large and valuable one, is, relatively to the remaining soil and waters, if not insignificant, yet certainly, in view of the purposes to be effected, not unreasonable. It is matter of common knowledge that a great railroad system, like that of the Illinois Central Railroad Company, requires an extensive and constantly increasing territory for its terminal facilities.

It would seem to be plain that, if the State of Illinois has the power, by her legislature, to grant private rights and interests in parcels of soil under her navigable waters, the extent of such a grant and its effect upon the public interests in the lands and waters remaining are matters of legislative discretion.

Assuming, then, that the State of Illinois possesses the power to confer by grant, upon the 'Illinois Central Railroad Company, private rights and property in the lands of the State underlying the waters of the lake, we come to inquire whether she has exercised that power by a valid enactment, and if so, whether the grant so made has been legally revoked.

It was contended, on behalf of the State, that the act of 1869, purporting to confer upon the railroad company certain rights in the lands in question, did not really so operate, because the record of proceedings in the senate does not show that the bill was read three times during its passage, and because the title of the bill does not sufficiently express the purpose of the

bill—both of which are constitutional requisites to valid legis-
lation.

It is unnecessary to discuss these objections in this opinion,
because the court below held them untenable, and because the
opinion of the majority in this court adopts the reasoning and
conclusion of the court below in this regard.

It was further contended, on behalf of the State, that, even
if the act of 1869 were a valid exercise of legislative power,
yet the grant thereby made did not vest in the railroad com-
pany rights and franchises in the nature of private property,
but merely conferred upon the company certain powers for
public purposes, which were taken and held by the company
as an agency of the State, and which accordingly could be
recalled by the State whenever, in her wisdom, she deemed it
for the public interest to do so, without thereby infringing a
contract existing between her and the railroad company.

This is a question that must be decided by the terms of the
grant, read in the light of the nature of the power exercised,
of the character of the railroad company as a corporation
created to carry out public purposes, and of the facts and
circumstances disclosed by the record.

It must be conceded, *in limine*, that, in construing this
grant, the State is entitled to the benefit of certain well-
settled canons of construction that pertain to grants by the
State to private persons or corporations, as, for instance, that
if there is any ambiguity or uncertainty in the act that inter-
pretation must be put upon it which is most favorable to the
State; that the words of the grant, being attributable to the
party procuring the legislation, are to receive a strict con-
struction as against the grantee; and that, as the State acts
for the public good, we should expect to find the grant con-
sistent with good morals and the general welfare of the State
at large and of the particular community to be affected.

These are large concessions, and, of course, in order to de-
feat the grant, they ought not to be pushed beyond the bounds
of reason, so as to result in a strained and improbable construc-
tion. Reasonable effect must be given to the language em-
ployed, and the manifest intent of the enactment must prevail.

By an act of Congress, approved September 20, 1850, 9 Stat. 466, c. 61, the right of way not exceeding 200 feet in width through the public lands was granted to the State of Illinois, for the construction of a railroad from the southern terminus of the Illinois and Michigan Canal in that State (at La Salle) to Cairo, at the confluence of the Ohio and Mississippi Rivers, with a branch from that line to Chicago, and another, *via* the city of Galena, to Dubuque, in the State of Iowa. A grant of public lands was also made to the State to aid in the construction of the railroad and branches, which, by the terms of the act, were to " be and remain a public highway for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States." It was also provided that the United States mail should at all times be transported on the said railroad under the direction of the Post Office Department at such price as the Congress might by law direct.

This act of Congress was formally accepted by the legislature of the State, February 17, 1851. Laws of Ill., 1851, 192, 193. Seven days before the acceptance — February 10, 1851 — the Illinois Central Railroad Company was incorporated for the purpose of constructing, maintaining and operating the railroad and branches contemplated in the act of Congress.

By the second section of its charter, the company was authorized and empowered " to survey, locate, construct, complete, alter, maintain and operate a railroad with one or more tracks or lines of rails, from the southern terminus of the Illinois and Michigan Canal to a point at the city of Cairo, with a branch of the same to the city of Chicago on Lake Michigan, and also a branch *via* the city of Galena to a point on the Mississippi River opposite the town of Dubuque in the State of Iowa."

It was provided in the third section that " the said corporation shall have the right of way upon, and may appropriate to its sole use and control for the purposes contemplated herein, land not exceeding two hundred feet in width through its entire length; may enter upon and take possession of and use all and

singular any lands, streams and materials of every kind, for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil banks, turnouts, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges belonging to the State are hereby granted to said corporation for said purposes; but when owned or belonging to any person, company or corporation, and cannot be obtained by voluntary grant or release, the same may be taken and paid for, if any damages are awarded, in the manner provided in 'An act to provide for a general system of railroad incorporations,' approved November 5, 1849, and the final decision or award shall vest in the corporation hereby created all the rights, franchises and immunities in said act contemplated and provided."

The eighth section had the following provision : "Nothing in this act contained shall authorize said corporation to make a location of their track within any city without the consent of the common council of said city."

By the fifteenth section, the right of way and all the lands granted to the State by the act of Congress before mentioned, and also the right of way over and through lands owned by the State, were ceded and granted to the corporation for the "purpose of surveying, locating, constructing, completing, altering, maintaining and operating said road and branches." There was a requirement in this section (clause 3) that the railroad should be built into the city of Chicago.

By the eighteenth section, the company was required, in consideration of the grants, privileges and franchises conferred, to pay into the treasury of the State, on the first Monday of December and June of each year, five per centum of the gross receipts of the road and branches for the six months then next preceding.

The twenty-second section provided for the assessment of an annual tax for state purposes upon all the property and assets of the corporation; and if this tax and the five per cent charge upon the gross receipts should not amount to seven per cent

of the total proceeds, receipts or income of the company, it was required to pay the difference into the State treasury, "so as to make the whole amount paid equal at least to seven per cent of the gross receipts of said corporation." Exemption was granted in that section from "all taxation of every kind, except as herein provided for."

The act of November 5, 1849, referred to in the third section of the charter, provided a mode for condemning land required for railroad uses, and contained an express provision that upon the entry of judgment the corporation "shall become seized in fee of all the lands and real estate described during the continuance of the corporation." 2 Laws of Illinois, 1849, 27.

The consent of the common council to the location of the railroad within the city of Chicago was given by an ordinance passed June 14, 1852.

On the 16th of April, 1869, an act was passed by the legislature of Illinois, entitled "An act in relation to a portion of the submerged lands and Lake Park grounds lying on and adjacent to the shore of Lake Michigan, on the eastern frontage of the city of Chicago." The third section of this act provided as follows:

"Sec. 3. The right of the Illinois Central Railroad Company, under the grant from the State in its charter, which said grant constitutes a part of the consideration for which the said company pays to the State at least seven per cent of its gross earnings, and under and by virtue of its appropriation, occupancy, use and control, and the riparian ownership incident to such grant, appropriation, occupancy, use and control, in and to the lands submerged or otherwise lying east of the said line running parallel with and four hundred feet east of the west line of Michigan Avenue, in fractional sections ten (10) and fifteen (15), township and range as aforesaid, is hereby confirmed; and all the right and title of the State of Illinois, in and to the submerged lands constituting the bed of Lake Michigan, and lying east of the tracks and breakwater of the Illinois Central Railroad Company for the distance of one mile, and between the south line of the south pier extended eastwardly, and a line extended eastward from the south line

of lot twenty-one, south of and near to the round-house and machine shops of said company, in the south division of the said city of Chicago, are hereby granted, in fee, to the said Illinois Central Railroad Company, its successor and assigns: *Provided, however*, That the fee to said lands shall be held by said company in perpetuity, and that the said company shall not have power to grant, sell or convey the fee to the same, and that all gross receipts from use, profits, leases, or otherwise of said lands or the improvements thereon, or that may hereafter be made thereon, shall form a part of the gross proceeds, receipts and income of the said Illinois Central Railroad Company, upon which said company shall forever pay into the State treasury, semi-annually, the per centum provided for in its charter, in accordance with the requirements of said charter: *And provided, also*, That nothing herein contained shall authorize obstructions to the Chicago harbor, or impair the public right of navigation, nor shall this act be construed to exempt the Illinois Central Railroad Company, its lessees or assigns, from any act of the general assembly, which may be hereafter passed, regulating the rates of wharfage and dockage to be charged in said harbor: *And provided further*, That any of the lands hereby granted to the Illinois Central Railroad Company, and the improvements now or which may hereafter be on the same, which shall hereafter be leased by said Illinios Central Railroad Company to any person or corporation, or which may hereafter be occupied by any person or corporation other than said Illinois Central Railroad Company, shall not, during the continuance of such leasehold estate or of such occupancy, be exempt from municipal or other taxation." Ill. Laws 1869, 245, 246, 247.

By this act, the right of the railroad company to all the lands it had appropriated and occupied, lying east of a line drawn parallel to, and four hundred feet east of, the west line of Michigan Avenue, in fractional sections ten and fifteen, was confirmed; and a further grant was made to the company of the submerged lands lying east of its tracks and breakwater, within the distance of one mile therefrom, between the south line of the south pier extended eastwardly and a line extended eastward from the south line of lot twenty-one.

What is the fair and natural import of the language used?

So long as the act stands in force there seems to me to exist a *contract;* whereby the Illinois Central Company is to have and enjoy perpetual possession and control of the lands in question, with the right to improve the same and take the rents, issues and profits thereof, provided always that the company shall not have the power to sell or alien such lands, nor shall the company be authorized to maintain obstructions to the Chicago harbor, or to impair the public right of navigation; nor shall the company, its lessees or assigns, be exempted from any act of the general assembly, which may be hereafter passed, regulating the rates of wharfage and dockage to be charged in said harbor, and whereby, in consideration of the grant of these rights and privileges, it shall be the duty of the company to pay, and the right of the State to receive, seven per cent of the gross receipts of the railroad company from "use, profits, leases or otherwise, of said land or the improvements thereon, or that may be hereafter made thereon."

Should the railroad company attempt to disregard the restraint on alienating the said lands, the State can, by judicial proceeding, enjoin such an act, or can treat it as a legal ground of forfeiting the grant; or, if the railroad company fails or refuses to pay the per centum provided for, the State can enforce such payment by suit at law, and possibly by proceedings to forfeit the grant. But so long as the railroad company shall fulfil its part of the agreement, so long is the State of Illinois inhibited by the Constitution of the United States from passing any act impairing the obligation of the contract.

Doubtless there are limitations, both expressed and implied, on the title to and control over these lands by the company. As we have seen, the company is expressly forbidden to obstruct Chicago harbor, or to impair the public right of navigation. So, from the nature of the railroad corporation and of its relation to the State and the public, the improvements put upon these lands by the company must be consistent with their duties as common carriers, and must be calculated to

promote the efficiency of the railroad in the receipt and ship-ment of freight from and by the lake. But these are inci-dents of the grant and do not operate to defeat it.

To prevent misapprehension, it may be well to say that it is not pretended in this view of the case that the State can part, or has parted, by contract, with her sovereign powers. The railroad company takes and holds these lands subject at all times to the same sovereign powers in the State as obtain in the case of other owners of property. Nor can the grant in this case be regarded as in any way hostile to the powers of the general government in the control of harbors and naviga-ble waters.

The able and interesting statement, in the opinion of the majority, of the rights of the public in the navigable waters, and of the limitation of the powers of the State to part with its control over them, is not dissented from. But its pertinency in the present discussion is not clearly seen. It will be time enough to invoke the doctrine of the inviolability of public rights when and if the railroad company shall attempt to dis-regard them.

Should the State of Illinois see, in the great and unforeseen growth of the city of Chicago and of the lake commerce, reason to doubt the prudence of her legislature in entering into the contract created by the passage and acceptance of the act of 1869, she can take the rights and property of the rail-road company in these lands by a constitutional condemnation of them. So, freed from the shackles of an undesirable con-tract, she can make, as she expresses in her bill the desire to do, a "more advantageous sale or disposition to other parties," without offence to the law of the land.

The doctrine that a State, by making a grant to a cor-poration of her own creation, subjects herself to the restraints of law judicially interpreted, has been impugned by able po-litical thinkers, who may, perhaps, find in the decision of the court in the present case some countenance of their views. But I am unable to suppose that there is any intention on the part of this court to depart from its doctrine so often ex-pressed.

"We have no knowledge of any authority or principle which could support the doctrine that a legislative grant is revocable in its own nature, and held only *durante bene placito.* Such a doctrine . . . is utterly inconsistent with a great and fundamental principle of a republican government, the right of the citizens to the free enjoyment of their property legally acquired."

"A private corporation created by the legislature may lose its franchises by a *misuser* or *non-user* of them, and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture. . . . But that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the State, or dispose of the same to such purposes as they may please, without the consent or default of the corporators, we are not prepared to admit; and we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and the letter of the Constitution of the United States, and upon the decisions of most respectable judicial tribunals, in resisting such a doctrine." *Terrett* v. *Taylor,* 9 Cranch, 43, 51, 52.

In *Stone* v. *Mississippi,* 101 U. S. 814, 816, Chief Justice Waite, in delivering the opinion of the court, said: "It is now too late to contend that any contract which a State actually enters into, when granting a charter to a private corporation, is not within the protection of the clause in the Constitution of the United States that prohibits States from passing laws impairing the obligation of contracts. The doctrines of *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. 518, announced by this court more than sixty years ago, have become so imbedded in the jurisprudence of the United States as to make them to all intents and purposes a part of the Constitution itself."

The obvious conclusion from the foregoing view of the case is that the act of 1873, as an arbitrary act of revocation, not passed in the exercise of any reserved power, is void, that the

decree of the court below should be reversed, and that that court should be directed to enter a decree dismissing the bill of the State of Illinois and the cross-bill of the city of Chicago.

I am authorized to state that MR. JUSTICE GRAY and MR. JUSTICE BROWN concur in this dissent.

The CHIEF JUSTICE, having been of counsel in the court below, and MR. JUSTICE BLATCHFORD, being a stockholder in the Illinois Central Railroad Company, did not take any part in the consideration or decision of these cases.